SUPERIOR COURT 
 
 COMMONWEALTH vs. JAMES B. CARVER

 
 Docket:
 8877CR13527
 
 
 Dates:
 December 23, 2024
 
 
 Present:
 Jeffrey T. Karp Associate Justice, Superior Court
 
 
 County:
 ESSEX
 

 
 Keywords:
 MEMORANDUM OF DECISION AND ORDER ON DEFENDANT'S FIFTH MOTION FOR NEW TRIAL (Paper No. 159)
 
 

             On July 4, 1984, fifteen residents of the Elliot Chambers rooming house in Beverly ("ECRH" or "Building") were killed during an early morning fire. On November 22, 1989, defendant James Carver was convicted by a jury of fifteen counts of second degree murder (and one count of burning a dwelling house) for setting the fire. Carver was sentenced to life in prison with the possibility of parole, a sentence he is still serving.
            Now before the Court is the Defendant's Fifth Motion For New Trial (Paper No. 159) ("Motion"), on which the Court conducted evidentiary hearings on April 9, 10, 11, and 12, and May 29, 2024.[1]
 
--------------------------------------------
 
[1] Also before the Court are the following memoranda: (I) the Defendant's Memorandum Of Law In Support Of 2022 Motion For Post Conviction Relief (Paper No. 160); (ii) the Commonwealth's Opposition To Defendant's Fifth New Trial Motion (Paper No. 169) ("Commonwealth's Opposition"); (iii) the Defendant's Supplemental Memorandum Of Law And Reply To The Commonwealth's Opposition To The Defendant's Fifth New Trial Motion (Paper No. 172) ("Supplemental Memorandum"); (iv) the Commonwealth's Opposition To The Defendant's Supplemental Claims In Support Of His Fifth New Trial Motion (Paper No. 182); and; (v) the Defendant's Post-Hearing Memorandum Of Law And Reply To The Commonwealth's May 13, 2024 Filing (Paper No. 184) ("Post-Hearing Reply").
 
                                                            -1-
 
            In the Motion, Carver argues that he is entitled to a new trial for three reasons. First, he claims that advances in fire science establish that the Commonwealth's theories at trial regarding the cause and point of origin of the fire were flawed and unreliable. Second, Carver contends that advances in the science of eyewitness identification and memory establish that certain eyewitness evidence presented at the trial was unreliable. Third, he argues that a confluence of factors acting together, including these advances in science and the personal and professional misconduct of his trial counsel, have caused a substantial risk that his trial was a miscarriage of justice.
            At the evidentiary hearings, the Court heard testimony from two fire science experts, Craig Beyler, Ph.D., and Michael Mazza, as well as Nancy Franklin, Ph.D., an expert in the field of eyewitness identification and memory. The Court also received in evidence dozens of exhibits, including reports authored by the two fire science experts.
            As is fully explained below, after thorough consideration of the parties' submissions, the arguments of counsel, and the evidence presented at the hearing, and careful review of the evidence presented at the trial, the Motion is ALLOWED.
RELEVANT PROCEDURAL HISTORY
            On May 4, 1988, the Grand Jury returned sixteen indictments against Carver charging him with fifteen counts of second degree murder and one count of burning a dwelling house.
On March 24, 1989, Carver's "first trial ended in a mistrial because of prosecutorial misconduct" regarding discovery violations. Commonwealth v. Carver, 33 Mass. App. Ct. 378, 379 (1992).
 
                                                            -2-
 
            In November 1989, the Court (Mathers, J., presiding) conducted Carver's second trial over twelve trial days.[2] Carver was convicted by the jury of all charges on November 22, 1989.
            On December 1, 1989, Carver was sentenced to two consecutive life sentences on the fifteen counts of second degree murder and 15 - 20 years in state prison on the charge of burning a dwelling house.
            In December 1990, Carver filed his first motion for new trial, see Paper No. 117, in which he argued that he was entitled to a new trial due to newly discovered evidence that Miles Hale, a prison inmate, "admitted to two other inmates that ii was he and another woman by the name of Lisa Dion who set fire to the rooming house: specifically, that Dion and Hale were standing near the rooming house; Dion set some newspapers on fire; and Hale threw the papers 'inside the door of the building and then we all took a walk."' Memorandum Of Decision And Order On Defendant's Motion For New Trial (Paper No. 122), pp. 1 - 2.
            On May 30, 1991, the trial judge denied Carver's first motion for new trial, ruling that:
The alleged confession (which Hale now denies ever making) does not square with the expert testimony regarding the fire's point of origin and its cause. The uncontested trial testimony of the Commonwealth's expert, Fire Marshal Robert Doran (Doran), stated that the fire's point of origin was outside the building in an alcove, not inside the building, as the alleged confession indicates. Doran's testimony was further corroborated by firefighters who testified that they had to physically remove the stack of newspapers from the doorway before they could enter into the hallway.
 
--------------------------------------------
 
[2] Judge Mathers has retired.
 
                                                            -3-
 
Doran further testified that the cause of the fire was a stack of newspapers, doused with a flammable liquid, to which an open flame was then applied. The alleged confession states that some newspapers were set on fire and tossed into the hallway of the building; there is no mention of any liquid flammables.
Id. at p. 3 (emphasis added).
            On October 6, 1992, the Appeals Court affirmed the jury's verdict and the denial of Carver's first motion for new trial. Carver, 33 Mass. App. Ct. at 379.
            In August 1994, Carver filed his second motion for new trial in which he argued that he was entitled to a new trial because, inter alia, his trial counsel failed to consult with him prior to waiving his right to have the jury consider a verdict on the lesser offense of involuntary manslaughter. See Paper No. 125.
            In September 1994, the Court (Mather, J.) denied the second motion for new trial in a margin endorsement. Id.
            In September 1998, Carver filed his third motion for new trial in which he argued that he was entitled to a new trial because his trial counsel "created a serious conflict of interest" by allegedly having sexual relations with Carver's then-wife during the two trials of this matter. See Paper No. 129.
            In February 1999, after conducting an evidentiary hearing on the motion, the court (Merrick, J.) denied the third motion for new trial, ruling that Carver knew this information when he filed his first motion for a new trial and, thus, waived that claim by failing to raise it. Order (Paper No. 135), p. 1. Further, finding that the testimony of Carver's ex-wife was not credible,[3] the court ruled that "the defendant has simply not presented evidence sufficient for this Court to find that a genuine conflict of interest
 
--------------------------------------------
 
[3] Carver and his wife apparently were divorced sometime prior to the hearing on the third motion for new trial.
 
                                                            -4-
 
actually existed. The defendant has, at best, raised an issue as to a potential conflict of interest." Id. at p. 2.
            On November 22, 2000, the Appeals Court, in an unpublished decision, affirmed the denial of the third motion for new trial. See Commonwealth v. Carver, 50 Mass. App. Ct. 1108, 2000 Mass. App. LEXIS 1003 (2000); Paper No. 143.
            In February 2008, Carver filed his fourth motion for new trial, arguing that he had newly discovered evidence that a resident of the ECRH named Moore, who died in the fire, had a history of setting fires at a nearby restaurant he frequented and that this resident's mattress caught on fire when he was staying at another rooming house. See Paper No. 148. The court (Welch, J.) denied that motion in June 2008 without a hearing, ruling that "[t]he affidavits do not contain any information linking Moore to this arson and do not contradict the substantial evidence presented at trial." Margin Endorsement Order dated June 6, 2008.
            On October 16, 2009, the Appeals Court, in an unpublished decision, affirmed the denial of the fourth motion for new trial, ruling that, "[w]hatever problems the new suspect may have had, nothing in the affidavits, or apparently generated in the investigation for which the defendant received funds, ties the new suspect to the fire.". Commonwealth v. Carver, 75 Mass. App. Ct. 1107, 2009 Mass. App. Unpub. LEXIS 1078, at *1 (2009); Paper No. 154.
            On March 28, 2022, Carver filed the Motion, i.e., his fifth motion for new trial.
 
                                                            -5-
 
FINDINGS OF FACT
            The Court makes the following findings, which are based on the credible evidence presented at the hearings and the reasonable inferences the Court has drawn from the evidence.[4]
            A. THE EVIDENCE AT CARVER'S SECOND TRIAL
                        1. The Appeals Court's Summary Of The Trial Evidence
            The following is the Appeals Court's "summar[y of] the pertinent evidence presented at the trial," Carver, 33 Mass. App. Ct. at 379, which the Court sets forth to provide an overview of the evidence at the trial:
Fifteen people died in an early morning fire on July 4, 1984, at the Elliott Chambers rooming house in Beverly. An arson investigator, [Robert Doran,] who inspected the scene on July 9, 1984, determined that the fire began in the alcove adjacent to the front entrance to the rooming house. [Doran] concluded that the fire had started on a stack of newspapers found next to the door which had been set on fire with some type of hydrocarbon [liquid] accelerant. He ruled out electrical failure or spontaneous combustion as a cause of the fire.
In the early evening on July 3, 1984, the defendant was at work at the Atlantic House of Pizza [("AHOP")], which is near the Elliott Chambers rooming house. In the alley adjacent to the defendant's work place, he encountered Rick Nickerson, who[, unknown to the defendant,] lived at the Elliott Chambers rooming house. The defendant warned Nickerson that if he continued to date the defendant's former girlfriend, Lisa Maggiacomo, he would kill him and burn his house down.
At about 1:15 a.m. on July 4, 1984, the defendant told a friend[, Pamela Proulx Flynn,] that he was upset because he had broken up with Lisa and that he wanted her back.
Between 3:00 a.m. and 4:00 a.m., a cab driver[, Stanley Clark,] observed the defendant standing in front of the rooming house and saw a car which fit the description of the defendant's car[, a two
 
--------------------------------------------
 
[4] The Court sets forth additional findings of fact in the Conclusions of Law section, infra.
 
                                                            -6-
 
door, blue 1974 Mercury Cougar,] parked adjacent to the rooming house.
Around 4:0(5] a.m., Florence Michaud, who delivered newspapers in the neighborhood, [while stopped at a traffic light,] saw a man standing in the entry way to the rooming house leaning over a stack of newspapers. She could not identify the defendant as the man she had seen.
At about the same time, Harold Eastman was delivering papers to the drug store adjacent to the rooming house and saw a man standing in the doorway to the rooming house smoking a cigarette. He testified that the defendant was not this man. The fire broke out at about 4:18 a.m. The defendant's parents[, Gail and Roger Carver,] testified that the defendant was at home asleep at that time.
In the months that followed the aftermath of the fire, the defendant made a number of incriminating statements, including an admission to two friends that he had set the fire.
Id. at 379.
                        2. The Building
            The Building was located at 434 - 438 Rantoul St. in Beverly, on the corner of Rantoul and Elliott Streets. It was a three-story wood-framed, mixed-use building that was of "balloon construction," which meant fire stops were not built into the wood framing between the floors.
            The first floor of the Building contained a few stores, including Davis drugstore and a barbershop. The second and third floors of the Building contained the ECRH, which consisted of approximately thirty-five rooms.
            A front entryway alcove located adjacent to the sidewalk on Rantoul St. provided access to the ECRH through a metal exterior door to the ECRH on the second and third floors of the Building. The front alcove had three interior walls, one of which contained
 
                                                            -7-
 
the metal exterior door, which opened to an interior stairwell that led to the ECRH on the second and third floors of the Building. The floor of the front alcove was concrete.
            The Davis drugstore, which was on the corner of Rantoul St. and Elliot St., was adjacent to the left side of the front entryway alcove of the Building (when facing the Building). A barbershop, located at 438 Elliot St., was adjacent to the right side of the alcove. It had a glass entry door and glass front windows. There was a barber's pole in
the front window closest to the alcove. See Trial Ex. 7, which was admitted at the Motion hearings as Ex. 10C.[5]
            As is discussed below, the fire was said to have started inside the front alcove at the bottom corner of the wall, to the right of the metal exterior door (when facing the Building).
3. The Fire In The Front Alcove According To Responding Firefighters
            On July 4 at approximately 4:15 a.m., Officer Duane Hathaway of the Beverly Police Department ("BPD") was on patrol approximately one-half mile from the Building when he observed a fire burning.[6] Upon seeing the fire, he "notified the [police] station," drove to the Building and parked near the front entrance. There were no other cars parked in front of the Building at the time. Hathaway, who was the first emergency responder to arrive on scene, observed that the front alcove was engulfed in flames. He approached the front alcove and did not see a stack of newspapers nearby. Unable to
 
--------------------------------------------
 
[5] The Court will refer to the exhibits that were admitted during the trial as "Tr. Ex." and those that were admitted during the Motion hearings as "M. Ex."
[6] Carver called Officer Hathaway as a defense witness at the trial. Hathaway explained to the jury that the trial prosecutor viewed his cooperation with the defense as disloyal.
 
                                                            -8-
 
enter the Building, Hathaway went to the rear fire escape of the Building and rescued four people.
            At 4:18 a.m., Officer Clifford Woodfin of the BPD received a radio call that prompted him to go to the intersection of Rantoul and Elliott Streets. He saw that the front of the Building was fully engulfed in flames and people were screaming for help out the windows of the ECRH.[7]
            Meanwhile, at 4:18 a.m., the fire alarm dispatcher at the Beverly Fire Department ("BFD") overheard a police officer reporting a fire at the Building and dispatched firefighters to the scene.
            Upon arrival at the front of the Building, firefighters, including Lieutenant Louis Bennett, observed heavy smoke and a fire burning inside the front alcove. There was an "overlapping fire" coming from the second floor windows, directly above the entrance to the Building. Unable to enter the Building, the firefighters began fire suppression and ladder rescue efforts.
                        4. The Stack Of Newspapers
            After performing rescue efforts at the rear of the Building, Lt. Bennett returned to the front of the Building. The fire in the alcove had been extinguished.
            On the right side of the floor of the alcove, Lt. Bennett observed a stack of newspapers that was "burnt on top." The stack of newspapers, which was tied together, had been delivered to the front of Davis drugstore at 4:10 a.m. by Harold Eastman.[8]
            The stack of newspapers, which was jammed against the wall, prevented
 
--------------------------------------------
 
[7] No fire equipment had yet arrived.
[8] Shortly after delivering the newspapers to Davis drugstore, Eastman observed a fire burning at the Building. He saw that the newspapers were no longer where he had delivered them.
 
                                                            -9-
 
Lt. Bennett from opening the exterior metal door to the Building. He used his heel to kick the stack out of his way and onto the nearby sidewalk. Lt. Bennett then opened the front door to the Building, which was unlocked, and entered. He did not smell gasoline or "[any]thing of that nature" while inside the alcove.
                        5. Evidence Regarding The Presence Of An Accelerant
            After the fire was extinguished, investigators observed loose newspapers and a stack of twelve newspapers near the entrance to the barber shop. According to Francis Hankard, a chemist with the Massachusetts State Police ("MSP"), a sample taken from the stack of newspapers, which were burnt around the edges, tested negative for the presence of flammable liquids.
            However, a sample taken from a wall of the interior first floor stairway of the Building located immediately inside the front doorway tested positive for the presence of kerosene or charcoal lighter fluid.
                        6. The Fire Investigation By Fire Marshal Doran
            Doran, the commanding officer of the Investigation Bureau at the Nassau County, New York Fire Marshal's Office, was the only fire investigator that testified at the trial. He was a very experienced fire investigator, having taken (and taught) hundreds of hours of specialized fire investigation training. Doran served as a consultant with the United States Bureau of Alcohol, Tobacco, and Firearms regarding cause and origin of fire, and was a member of a national fire investigation response team.
            On July 9 and 10, 1984, Doran examined the fire scene at the Building, which he noted was "balloon construction."
 
                                                            -10-
 
            Doran observed a "protected area" (i.e., an uncharred section) on a wall inside the front alcove of the Building ("Protected Area"). The Protected Area was located on the bottom of the wood wall on the right side of the front alcove, adjacent to the exterior metal door to the Building.[9] Doran was told that a responding firefighter had discovered and removed a stack of newspapers that was found near the wood wall where he observed the Protected Area.
            Doran concluded that the point of origin of the fire was the Protected Area. He determined that the fire had a single point of origin because "[t]here were no other lower points of burn." He explained that in determining the point of origin, he looked for the lowest point of burn because "fire will not burn down."[10]
            Doran testified that the cause of the fire was the ignition of the stack of newspapers with an open flame that was applied to a "flammable liquid," such as gasoline, lighter fluid, methylethylene, or acetone. He conceded that he could not identify the precise flammable liquid used.
            Doran determined that the bundle of newspapers was laying on the floor of the front alcove when it was ignited. He concluded that the stack had left an uncharred area on the wall (i.e., the Protected Area) because Lt. Bennett had kicked the bundle away while it was burning, but still intact.
            According to Doran, after originating at the Protected Area, the fire spread up the wall of the alcove and entered the Building through a glass transom located above the
 
--------------------------------------------
 
[9] Photographs that were admitted into evidence at the trial (and at the hearings on the Motion) clearly depict an uncharred portion of a wall. See M. Exs. 10B and 10D.
[10] Doran ruled out "drop down" burning, which, as is discussed below, is the spreading of a fire by the falling of burning materials.
 
                                                            -11-
 
exterior metal front door. From there, the fire travelled quickly to the second and third floors of the Building due to its "balloon construction."
            Doran based his conclusion that a flammable liquid was used on two observations he made of the front alcove. First, he observed the presence of large blisters that resembled the back of an alligator (i.e., "alligatoring") on the wall above the Protected Area. He testified that the alligatoring was evidence of a quick generation of a high temperature, which was consistent with the ignition of a flammable liquid and inconsistent with the newspapers being the sole ignition source. Second, Doran observed a "swirling smoke stain" on a formica-covered wall inside the front alcove, which he concluded was evidence of the presence of hydrocarbons that are found in flammable liquids.
            Doran dismissed the results of the testing that found no evidence of a flammable liquid in the newspapers or in the front alcove because, in his view, the heavy volume of water used to suppress the fire would have washed it away.
            Doran testified that he ruled out an electrical malfunction as the cause of the fire. He explained that copper wiring, like that present in the Building, becomes brittle to the touch when it is heated internally by an electrical surge. However, the only wiring he observed in the front alcove was a copper wire, which he determined had retained its flexibility (i.e., the wire was not brittle).
            Doran also ruled out an accidental ignition of the newspapers by a lit cigarette or match as the cause of the fire because he believed that would not have generated sufficient heat to ignite the stack of newspapers. Moreover, Doran testified that he ruled out "spontaneous heating" as the cause of the fire because there was nothing found in
 
                                                            -12-
 
the Building that was susceptible to spontaneous combustion, such as linseed oil or fir oil.
                        7. Carver's Confrontation With Nickerson On July 3rd
            Carver and Lisa Maggiacomo ("Lisa")[11] were in a longstanding relationship. They had been engaged to be married until May 1984, when Carver ended the relationship and asked that she return the engagement ring he had given her. In the following weeks, they remained friendly, although Carver was very upset over the break-up and wanted to reunite.
            In the meantime, Lisa went on two dates with Nickerson, who worked at a pool hall next door to the AHOP. Carver was jealous of their budding relationship and told Lisa that he would kill Nickerson over it. Prior to the fire, neither Lisa nor Carver knew that Nickerson lived at the ECRH.
            During the early evening hours of July 3, 1984, Carver confronted Nickerson in an alley between the AHOP and the pool hall. Thomas Page, Lisa (Dion) Kobuszewski, and Laura Proulx were present during the confrontation; all three of them knew Carver and Lisa.
            Page, who worked at the pool hall with Nickerson and Kobuszewski, testified that he heard Carver tell Nickerson that if Nickerson ever saw Lisa again, "I'll kill you and burn your house down." Nevertheless, according to Page, Nickerson did not appear to be in any fear during the argument. Laura Proulx and Kobuszewski denied hearing Carver threaten to burn Nickerson's home. Instead, Laura Proulx testified that she heard Carver say that he did not want Lisa to see Nickerson anymore, and if she did,
 
--------------------------------------------
 
[11] The Court will refer to Ms. Maggiacomo by her first name because she shares a surname with her brother, Jim Maggiacomo, who is mentioned later in the decision.
 
                                                            -13-
 
Carver "was going to see him burn in hell." Kobuszewski testified that Carver told Nickerson something like, "stay away from Lisa or I'll kick your face across the state."
                        8. Carver's Clothing And Car
            On July 14, 1984, Carver was interviewed by Sergeant John Malone of the MSP. When asked, Carver told Sgt. Malone about the confrontation he had with Nickerson on July 3rd and freely admitted that, prior to the fire, he was mad at Nickerson and wanted to beat him up. Carver described the clothing he wore on the night of July 3rd, "bib overalls" and three T-shirts, and gave investigators the clothing, which were photographed and admitted as evidence at the trial.
            Lisa and Pamela Proulx Flynn saw Carver wearing bib overalls and a T-shirt during the early morning hours of July 4th. Lisa described the T-shirt as a light blue "muscle shirt" that had no writing on it, which she identified at the trial and was one of the T-shirts that Sgt. Malone collected from Carver.
            At the time of the fire, Carver owned a two door, blue 1974 Mercury Cougar.
                        9. Stanley Clark's Identification Of Carver[12]
            On July 4th, Stanley Clark was working as a cab driver in the Beverly area, which he knew quite well.[13] He began his shift on July 3rd at 7:00 p.m.
            In the early morning hours, Clark was sent on a call to pick up two intoxicated people at the Danvers police station to bring them home to Beverly. At approximately 3:10 - 3:20 a.m., while traveling on Elliott St. in Beverly with the two customers seated
 
--------------------------------------------
 
[12] The Court will provide significant detail regarding Clark's testimony because in the Motion Carver challenges the reliability of Clark's identification.
[13] The prosecutor began his direct examination of Clark by impeaching Clark with the fact that he was convicted in 1985 of assault and battery on a police officer and two drug possession charges, and was sentenced to a suspended jail sentence and an unstated period of probation.
 
                                                            -14-
 
in the rear passenger seats of his taxicab, Clark stopped at a red light at the intersection of Elliott and Rantoul Streets. The Building was on his left.
            Clark saw three men standing near the front of the Building. Two of the men were standing together on the corner, near the mailbox. Clark described the two men as being "older people[,] ...one was rather heavy and the other was ...small and thin."[14]
            Clark also saw a third man standing behind the two older men, fifteen feet from the mailbox. See Tr. Ex. 7, M. Ex. 10C. More specifically, the third man was standing near the window of the barbershop that displayed the barber's pole (i.e., the barbershop window closest to the front alcove of the Building).
            After the light changed, Clark drove through the intersection and turned onto Rantoul Street. While doing so, he observed that the third man, who was facing Clark, was "just standing there ...leaning on the corner where the [barbershop] door and [barbershop] window met." This man was 5'11", unshaven (i.e., with about one week of growth), had dark hair, and was wearing dungaree bib overalls and a dark shirt with white lettering on it displayed in an arc.[15]
            At the same time, Clark observed two cars parked at parking meters along a vacant lot on the same side of Rantoul St. as the Building: a green Oldsmobile and a dark blue car that looked like a Ford Mustang, Mercury Cougar, or Ford Torino. He saw that the blue car had "mag wheels" and the front grill was smashed.[16] Clark proceeded
 
--------------------------------------------
 
[14] Clark described the corner as well-lit by nearby street lights, a large sign on top of the Davis drugstore, and fluorescent signs at a gas station across the street.
[15] Clark stated that he was able to see the lettering on the shirt, which may have said "naked in Massachusetts," under the bib overalls because it was in an arc.
[16] Clark identified the green Oldsmobile in a crime scene photograph while it was displayed to the jury. The blue car was said to have been outside the area depicted in the photograph.
 
                                                            -15-
 
through the intersection, dropped off the two customers, and drove to a nearby Dunkin Donuts shop.
            Approximately ten to twelve minutes after observing the man in the bib overalls, Clark drove down Rantoul St. towards the intersection at Elliott Street. The man and the two older men were no longer present near the Building. While driving through the intersection, Clark saw a stack of newspapers near the front doorway of the Davis drugstore.
            At approximately 3:45 a.m. Clark once again drove down Rantoul St. in the area of the Building. He observed a fire truck blocking the intersection adjacent to the Building and fire coming out of the front of the Building.[17] Clark also noticed that the stack of newspapers he had seen earlier near the front doorway of the Davis drugstore was no longer present.
            On July 13, 1984, Lieutenant Al Duemling of the BPD and Sgt. Malone of the MSP appeared without advance notice at Clark's home in Beverly and asked him to participate in a formal interview at a future time. This was the first contact Clark had with investigators.
            On July 14, 1984, after Sgt. Malone had interviewed Carver and collected the clothing that Carver said he was wearing on the night of July 3rd, Clark met with Sgt. Malone and was asked to describe the clothing that the suspect[18] was wearing.
 
--------------------------------------------
 
[17] Although he was not wearing a watch and the taxicab did not have a clock, Clark estimated the time of the events on July 4th by referring to a handwritten call log kept by the cab company. Tr. Ex. 17.
[18] For ease of clarity, the Court will hereafter refer to the man Clark saw standing in front of the Building before the fire as "the suspect."
 
                                                            -16-
 
            On July 16, 1984, Clark met with Detective Bouchard19 of the BPD and Sgt. Malone at the BPD.[20] He viewed photographs of the Building that were taken during the fire and saw the green Oldsmobile in one of the photographs. Clark told the investigators that the suspect had black hair and was wearing a dark blue T-shirt with white lettering that said something like "make it in Massachusetts." He did not mention that the suspect was wearing overalls.[21]
            Sgt. Malone and Det. Bouchard then drove Clark to the parking lot at Beverly Hospital in a police vehicle, knowing that Carver's blue Mercury Cougar was parked there, to see if Clark "could identify the [blue] car" that he had observed parked near the Building prior to the fire. It was mid-afternoon and there were 150 cars parked in the parking lot at the time. While seated in the front seat of the vehicle, Clark picked out Carver's blue Mercury Cougar, which he thought "could [have been] the car if it was a little darker," although from his vantage point he could not see whether the car had the same mag wheels and damaged front grill.[22]
            A few days later, while driving on Bridge St. in Beverly, Clark saw Carver seated in the blue car he had identified in the hospital parking lot. Carver was cleaning his
 
--------------------------------------------
 
[19] Del. Bouchard's first name was not mentioned at the trial or the Motion hearings.
[20] A stenographer was also present.
[21] On July 14, 1984, two days before the formal interview on July 16th , Sgt. Malone and Clark met and discussed the clothing that Clark observed the suspect wearing. This was after Sgt. Malone had interviewed Carver and collected the clothing that Carver said he was wearing on the night of July 3rd, including the bib overalls. The record provides no more pertinent details about what they discussed at the time.
[22] Clark made his observations solely from the front seat of the vehicle; he did not exit the vehicle while in the hospital parking lot.
 
                                                            -17-
 
sunglasses at the time. According to Clark, Carver's hair was shorter than the suspect's hair.
            On July 23, 1984, Clark, who was accompanied by his son and his then- girlfriend, met with Sgt. Malone and Lt. Duemling at "the command post," and he told them about seeing Carver in the same car he had pointed out in the hospital parking lot on July 16th.
            On July 24, 1984, Clark again met with investigators and told them, for the first time, that the suspect had been wearing bib overalls.[23] Thereafter, Clark moved to California.
            On August 21, 1984, Clark, who had been told during a previous telephone call "that a photo pack had been sent up from Massachusetts," went to the local (California) sheriffs department to participate in a photo array identification procedure. Before being shown the photographs, Clark read and signed a preprinted form, a copy of which was admitted into evidence. According to the prosecutor, who read it to the jury during the direct examination of Clark, the form stated the following:
You will be asked to look at a group of photographs. The fact that the photographs are shown to you should not influence your judgment. You should not conclude or guess that the photos contain the picture of the person who committed the crime. You are not obligated to identify anyone. It is just as important to free innocent persons from suspicion as to identify guilty parties. Please do not discuss the case with other witnesses or indicate in any way that you have identified anyone.
 
--------------------------------------------
 
[23] This was ten days after Carver told the investigators that he had been wearing "bib overalls" on July 4th and after he had given them the overalls.
 
                                                            -18-
 
Tr. Ex. 18.[24]
            The officers then simultaneously displayed nine Polaroid photographs to Clark, which included Carver's photograph. M. Ex. 101 ("Photo Array"). Clark "picked out" two photos. First, he selected the photo of the suspect, i.e., Carver's photo.[25] Tr. Ex. 19. Next, he selected a photo (Tr. Ex. 20) "to show that this is what the [suspect]'s hair looked like on the night that [he] had seen them at the [Building]." He told the officers "[t]hat's the length of the hair or type of cut that it was on that night." (emphasis added).
            In approximately January 1985, Clark moved back to Beverly from California.
            Clark's next contact with the investigators was in November 1987, when they showed the Photo Array to him for a second time. He once again selected Carver's photo (Tr. Ex. 19) and the same photo of the man with the aforementioned representative hair length or hairstyle (Tr. Ex. 20).
            In January 1988, while at the District Attorney's Office with the trial prosecutor and Sgt. Malone, Clark was shown the Photo Array for a third time with the same
 
--------------------------------------------
 
[24] Immediately after the prosecutor read the quoted excerpt to the jury, the judge instructed the jurors as follows:
Let me interrupt just briefly. Madam forelady, ladies and gentlemen, that document is something that you may consider as evidence of the circumstances surrounding an effort at identification. Yes, an effort at identification through photographs. It is a circumstance that may be taken into consideration by you. The exhibit does not in any way prove the truth or falsity of the text itself. In that respect, it is hearsay and it is inadmissible. So, you may not consider it as establishing the truth or falsity or reliability of the assertions that are made in the text, only [sp.] one of the circumstances surrounding the identification. You may consider it as [sp.] it assists you in believing an identification or it does not assist you in believing an identification has or was not made.
[25] When asked during re-direct examination what he told the officers when he selected the suspect's photograph, Clark replied that "exactly" what he told them was "[y]es, I'm sure that this is the guy."
 
                                                            -19-
 
results, although he had some difficulty explaining to the prosecutor why he selected the second photograph.
            On April 21, 1988, Clark participated in a lineup identification procedure at the Danvers Police Department. Before viewing the lineup, "[he] was given a piece of paper to read," which was titled "Instructions for Lineup" (Tr. Ex. 21).
            According to the prosecutor, who read it to the jury during the direct examination of Clark, the Instructions for Lineup stated the following:
We are going to ask you to observe a group of men. Our purpose in doing so is to determine whether or not you believe any of the men in the group is the man who you saw standing outside of the Elliott Chambers on July 4th, at about 4:00 in the morning wearing bib overalls. When you enter the room where the men are, they will be facing you. After you have had the opportunity to view them frontally, they will be asked to present a right and left profile and then to return to a frontal position. The men will be holding numbered cards. If you see anyone whom you believe to be the person who is standing in front of the Elliott Chambers on July 4, 1984, at about 4:00 a.m., wearing bib overalls, write his number at the bottom of the sheet. If you do not see anyone who you believe to be that person, write "None." Take as much time as you need to observe each man with care.
Tr. Ex. 21 (emphasis added).[26]
            Clark was then put in a room with the prosecutor and defense counsel (and two others), and was asked to look at eight men through a one way mirror. Carver was positioned as No. 6 in the lineup.
            After viewing the men, Clark stated, "I believe No. 6 is the person that I saw. Can I have him step forward?" Carver was directed to step forward and Clark identified Carver as the suspect, telling the people present in the room that "yes, that's the person that I saw."
 
--------------------------------------------
 
[26] The prosecutor read this to the jury during the direct examination of Clark.
 
                                                            -20-
 
            Clark did not know Carver and had never seen him before observing the suspect standing in front of the Building in the early morning hours of July 4, 1984.
            On cross-examination, Clark conceded that, over time after first being interviewed by police, "I remembered more. I remembered many different things as time went on."
            Clark identified Carver as the suspect in the courtroom during the trial.
            For his part, Carver called James Valentine as a witness. Valentine testified that he had known Clark for thirty years since they were children. In March 1989, while at a bar, Valentine overheard Clark telling someone that he would have been in California, rather than Beverly, but the police were holding his "PO" (probation) record "over his head" and forcing him to testify.[27]
                        10. Carver's Incriminating Statements
                                    I. Carver's Statements at Project Rap in July 1984
            On July 22, 1984, Lisa went to Project Rap, a social service agency where she had been receiving services, to meet with her longtime social worker, Susan Ohstrom. While Lisa was there, Carver called and went to Project Rap, and asked Ohstrom, who knew Carver, if Lisa was present. Carver was tearful and upset, but left Project Rap without incident.
            A short time later, Carver returned and was very angry. While parked outside of Project Rap, Carver began throwing Lisa's belongings from his car. Ohstrom approached Carver and he stated, "You're a fucking bitch. I'll burn your place just like I
 
--------------------------------------------
 
[27] Clark denied saying this and denied that he was on probation in March 1989.
 
                                                            -21-
 
did in Beverly."[28] Fearing for Lisa's safety, Ohstrom drove her home and Carver followed them. Ohstrom reported the incident to the police and was later interviewed by investigators.
            Sandra Caproni, another social worker at Project Rap who knew Carver, was present when Carver was throwing things from his car. She testified that she heard Carver say the following to Lisa: "I want your fucking friends to know I love you. They're nothing but a bunch of fucking jerks. This is the next place I'm going to burn."
                                    ii. Carver's Statements to Colleen Coletti in October 1984
            In October 1984, Carver called Colleen Coletti, a close friend and his former partner in a lawn mowing business. Coletti was staying at the home of the Proulx family at the time. Carver was crying and said that he needed to talk to her, but wanted to do so in person because he thought his phone was "tapped."
            Coletti then drove to Carver's home in Danvers and spoke to Carver in his bedroom. Carver had been drinking, "but wasn't intoxicated." Carver was very upset about his break-up with Lisa. He said that he had planned to marry Lisa and have children with her, and wanted her back. Carver showed Coletti an engagement ring and some photos of him and Lisa.
            Coletti and Carver then went to the living room and sat down. Carver, who was crying and rocking back and forth, slid down to the floor from the chair he had been sitting upon. He told Coletti that he wanted to kill himself and "that he didn't mean to hurt anyone." She asked Carver what he meant, and he responded, "the fire." She asked
 
--------------------------------------------
 
[28] Lisa testified that Carver stated, "You better watch out or I'll burn that place down, too."
 
                                                            -22-
 
Carver how he set the fire, and he responded that he used "[n]ewspapers, gasoline and a match" and set the fire "in the stairwell." Carver said that "he followed them home" in his car, but he didn't say whose home he was referring to and never mentioned the ECRH or the Davis drugstore. He told Coletti that "he wanted to scare Lisa and the guy she was seeing."
            Coletti told Carver to call the police and tell them what he just told her, but Carver said he "was afraid the police were just going to throw him in jail and not give him any help." During cross-examination, Coletti conceded that she questioned whether Carver was being truthful about claiming to have set the fire.[29]
            After speaking with Carver, Coletti returned to the Proulx home where she was staying at the time. Upon arrival, she told at least four people about Carver's statements, including Jim Maggiacomo (Lisa's brother), who was then a firefighter with the BFD, who told her to call the police. Coletti unsuccessfully attempted one time to contact Trooper Garvin, who had interviewed her about the fire in July 1984. She did not attempt to contact the police again because she "was scared [and] didn't want to get involved."[30]
iii. Carver's Statements to Andrew Smialek in November 1986
            In November 1986, when Carver was employed as a bus driver, he told a co- worker, Andrew Smialek, that, "I lit the fire but they have no proof, so I'll get off."
 
--------------------------------------------
[29] "On cross-examination, the judge precluded defense counsel from inquiring whether the defendant had lied to [Coletti] in the past to gain her sympathy." Carver, 33 Mass. App. Ct. at 383 (ruling that "[t]he judge properly sustained the objection, because the question called for a mere opinion or speculation as to another person's state of mind.").
[30] Trooper Garvin and other detectives contacted Coletti in March 1987 and knew about Carver's statements to her.
 
                                                            -23-
 
Smialek felt like this was "a cry for help" by Carver. But, Smialek did not want to "get involved" and walked away from Carver, and did not report the statement to authorities. However, Smialek eventually told a co-worker about the conversation and she contacted the investigators, who later interviewed Smialek in March 1989.
11. Carver's Defense
            Carver called twelve witnesses at the trial. Carver's parents testified that he was at home on July 4th at the time of the fire.
            Richard Kraus, the owner of the taxi cab business that Carver worked for at the time of the fire and which was located near the ECRH, testified that he had a cookout on July 4th that Carver and Lisa attended together. Kraus observed Carver to be in a good mood and there was nothing unusual about his demeanor. Kraus also testified that Carver parked his vehicle near the taxi business at 7:00 p.m. on July 3rd . when Carver began his shift, and that it remained parked there until late the next morning (well after the fire started).
            Carver called Blanche Poor and Diana Hampton, two residents of the ECRH who survived the fire, as witnesses. They both knew Nickerson well, did not know Carver, and were rescued from the fire by firefighters. Poor and Hampton described one of the occupants of the ECRH who died during the fire as being 5'10" - 5'11" tall, in his late 20s, who always wore bib overalls.
            Lori Brennan testified that she was from Beverly and did not know Carver. But, she saw coverage of the first trial in the news and approached the defense after the first trial ended. In August 1984 while Brennan was working on an ice cream truck in Beverly, Lisa Kobuszewski (Lisa Dion at the time}, who Brennan knew from high school,
 
                                                            -24-
 
told Brennan that she and a friend set the fire at the ECRH as an initiation ritual to join a cult group of witches. Brennan conceded that Kobuszewski appeared to be on drugs at the time of their encounter at the ice cream truck.
B. RELEVANT EVIDENCE NOT PRESENTED AT THE SECOND TRIAL
            Before discussing the newly discovered fire science evidence, the Court will turn to the results of a fire investigation that was conducted immediately after the fire by Trooper James Bradbury of the Massachusetts Fire Marshal's Office.
            Although Tpr. Bradbury did not testify at the second trial and none of his findings were presented to the jury, Tpr. Bradbury's findings are relevant to the Court's determination of whether the conclusions reached by the parties' experts, Dr. Beyler and Mazza, are based on advances in fire science. [31] [32]
            Tpr. James Bradbury's Fire Investigation In July 1984
            Tpr. Bradbury responded to the scene on July 4 before the fire was fully extinguished. He conducted an extensive fire investigation, which included interviewing firefighters who responded to the scene and examining the scene shortly after the fire was fully extinguished. Tpr. Bradbury's examination of the scene continued for several days.
            Tpr. Bradbury learned that first responding firefighters "found heavy fire involvement from the front doorway to the windows on the second and third floor." M. Ex. 8B, p. 4.
 
--------------------------------------------
 
[31] Mazza interviewed Tpr. Bradbury, who vividly remembered the fire and his investigation.
[32] Tpr. Bradbury's four page, single-spaced report, dated August 16, 1984, was admitted into evidence at the Motion hearings as M. Ex. BB.
 
                                                            -25-
 
            He observed several newspapers immediately outside of the entrance to the front alcove.[33] The edges of the newspapers "showed minor burning." Id. The newspapers were later tested for the presence of accelerants and "no trace of accelerants were detected."[34] Id.
            Tpr. Bradbury observed that the wooden walls in the front alcove on both sides of the metal front door of the Building suffered heavy fire damage, and that the hinges on the door showed characteristics consistent with the door being closed at the time of the fire. He also observed the Protected Area on the wall inside the front alcove.
            Tpr. Bradbury determined the fire's lowest point of burn was the Protected Area and "this [was] indicative of the area of origin of the fire." Id. He did not observe any evidence of drop down burning in the front alcove.
            A state electrical inspector, John Harris, examined the front alcove on July 5, 1984.[35] Harris found no evidence of any electrical malfunction in the alcove area or in a fluorescent Davis drugstore sign that was located above the alcove. He found "no evidence of an outside overhead light or fixture at [the] entryway and no evidence of any wiring of same." M. Ex. SC.
            Tpr. Bradbury eliminated an electrical source as an ignition source for the fire because "[n]o electrical devices were found at or near the floor area [of the front
 
--------------------------------------------
 
[33] Although he did not mention it in his final report, Tpr. Bradbury learned that first responding firefighters encountered a stack of newspapers in the front alcove.
[34] This was the only mention of accelerants in Tpr. Bradbury's report.
[35] Like Tpr. Bradbury, Harris did not testify at the second trial and his electrical inspection was not mentioned. Harris' report, dated July 6, 1984, was admitted into evidence at the Motion hearings as M. Ex. SC.
 
                                                            -26-
 
alcove]." M. Ex. 8B, p. 4. He also eliminated lightning and spontaneous combustion as causes of the fire.
            Tpr. Bradbury determined that the cause of the fire was the direct application of a heat source to newspapers located on the floor of the front alcove.
            Tpr. Bradbury opined that the flames spread up the wooden walls in the front alcove, through the transoms over the exterior door to the Building, and once inside the Building, the fire spread upward quickly into the second and third floors.
            C. POST-TRIAL DEVELOPMENTS IN FIRE SCIENCE
The NFPA Guide
            At the time of the fire in 1984, fire investigators, who were often former firefighters, mostly lacked scientific training and, instead, relied on their practical experience in conducting fire investigations and certain longstanding "rules of thumb." In short, there were few standardized procedures or methodologies used by fire investigators in 1984. That radically changed in 1992 with the publication by the National Fire Protection Association ("NFPA") of the Guide for Fire and Explosion lnvestigations,[36] which introduced the scientific method and scientific approaches to fire investigation.
            The NFPA Guide, which Dr. Beyler and Mazza agreed is the gold standard for fire investigations (i.e., the generally accepted standard of care), debunked certain long held beliefs (i.e., "rules of thumb") used by fire investigators, including Doran, such as the belief that the lowest point of burn is always the point of the fire's origin and the
 
--------------------------------------------
 
[36] The latest edition of the complete NFPA Guide for Fire and Explosion Investigations (2021 ed.) ("NFPA Guide") was admitted at the Motion hearings as M. Ex. 12.
 
                                                            -27-
 
belief that the presence of "alligatoring" is evidence of the use of a flammable liquid as an accelerant. [37]
            Significantly, the 2011 edition of the NFPA Guide for the first time precluded the use of "negative corpus" reasoning, also known as process of elimination reasoning, in fire investigations, a concept that was long commonly used by fire investigators, including Doran in this case. In broad terms, negative corpus reasoning is concluding that a fire was intentionally set by ruling out accidental causes, whether or not there is specific evidence of intentionality (i.e., the failure to find an accidental cause of a fire means that the fire was set intentionally).
            According to the NFPA Guide, negative corpus reasoning is "[i]dentifying the ignition source for a fire by believing to have eliminated all ignition sources found, known, or suspected to have been present in the area of origin, and for which no supporting evidence exists." M. Ex 12, NFPA Guide, ,I 19.6.5. The NFPA Guide also states that, "[t]he negative corpus process is not consistent with the scientific method, is inappropriate, and should not be used because it generates untestable hypotheses and may result in incorrect determinations of the ignition source and first fuel ignited."[38] Id.
 
--------------------------------------------
 
[37] According to the SJC, "the blistering effect that was thought to be consistent with the use of flammable liquid is now known to be found in many types of fires, whether or not flammable liquids were present." Commonwealth v. Rosario, 477 Mass. 69, 75 (2017).
[38] As is discussed in the next section of the Court's decision, it is an understatement to say that negative corpus reasoning is antithetical to the scientific method.
 
                                                            -28-
 
Embrace Of The Scientific Method By The NFPA Guide
            The NFPA Guide's embrace of the use of the scientific method in fire investigation in 1992, three years after Carver's trial, was transformative in the field of fire science and warrants some explanation[39]
            Modern fire investigation methodology applies the scientific method to determine three things. First, the area of origin is determined. The area of origin is the "general geographic location within a fire scene, in which the Point of Origin of a [f]ire ... is reasonably believed to be located." Id. at ,¶ 3.3.13. Next, if possible, the point of origin, i.e., the precise location where the fire started, within the area of origin is determined. Last, the cause of the fire is determined.
            The scientific method "includes recognizing and defining the problem to be solved, collecting data, analyzing the data, developing hypothes[e]s, and most importantly, testing the hypothes[e]s.[40]  Id. at ,I 18.2.  According to Dr. Beyler, the application of the scientific method in modern fire investigation involves three steps: data collection, formulation of hypotheses, and testing of the hypotheses.
            As stated, modern fire investigators first apply these steps to determine an "area of origin" of the fire. "The origin of a fire is one of the most important hypotheses that an
 
--------------------------------------------
 
[39] "Fire science" is defined in the NFPA Guide as "[t]he body of knowledge concerning the study of [f]ire and related subjects (such as [c]ombustion, flame, products of combustion, heat release, heat transfer, fire and explosion chemistry, fire and explosion dynamics, thermodynamics, kinetics, fluid mechanics, fire safety) and their interaction with people, structures, and the environment." Id. at ¶ 3.3.81.
[40] The "scientific method" is defined in the NFPA Guide as, "[t]he systematic pursuit of knowledge involving the recognition and definition of a problem; the collection of data through observation and experimentation; analysis of the data; the formulation, evaluation and testing of
hypotheses; and, where possible, the selection of a final hypothesis." M. Ex 12, NFPA Guide, ¶
3.3.167.
 
                                                            -29-
 
investigator develops and tests during the investigation. Generally, if the origin cannot be determined, the cause cannot be determined, and generally, if the correct origin is not identified, the subsequent cause determination will also be incorrect." Id. at ¶ 18.1.
            Next, the scientific method is applied to determine the point of origin. However, "[i]n some cases, it will be impossible to fix the point of origin of a fire Not identifying a point of origin will not necessarily preclude determining an origin and cause. In some situations, the extent of the damage may reduce the ability to specifically identify the point of origin, without removing the ability to put forward credible origin and cause hypotheses." Id. at 18.2.1.3.
            Lastly, modern fire investigators use the scientific method to determine the "cause" of the fire, which is defined by the NFPA Guide as "[t]he circumstances, conditions, or agencies that brought about or resulted in the [f]ire." Id. at ¶ 3.3.27. When formulating cause hypotheses, the investigator must consider all potential ignition sources and first burned material within the area of origin. The cause of the fire is determined after all cause hypotheses are tested and only one remains. At the conclusion of hypothesis testing, the cause is considered "undetermined" in the absence of a single surviving cause hypothesis[41]
 
--------------------------------------------
 
[41] The NFPA Guide explains the process for concluding that a fire cause is undetermined as follows:
In circumstances where all hypotheses have been rejected, or if two or more hypotheses cannot be rejected, the only choice for the investigator is to conclude that the fire cause, or specific causal factors, is undetermined. It is improper to base hypotheses on the absence of any supportive evidence. That is, it is improper to opine a specific fire cause, ignition source, or fuel that has no evidence to support it even though all other such hypothesized elements were eliminated.
Ex 12, NFPA Guide, ¶ 19.6.5.1.
 
                                                            -30-
 
Dr. Beyler And Mazza Agree That Some Of Doran's Conclusions Are Unreliable
            Dr. Beyler and Mazza agree with Doran's identification of the Protected Area. Pointing to the NFPA Guide, they also agree that there were "rules of thumb" that Doran applied when investigating the fire in this case that have since been deemed unreliable by the fire science community. Those debunked rules of thumb are: (a) the lowest point of burn is always the point of origin of the fire; (b) the appearance of shiny "alligatoring" char patterns and "smoke swirl" patterns are indicative of the presence of a flammable liquid ignition source;[42] and, (c) by measuring the depth of the charring, a fire investigator could calculate approximately how long that area had burned.
            Dr. Beyler and Mazza also agreed that whether a flammable liquid was used to ignite the fire at the Building could not be determined (i.e., the use of a flammable liquid ignition source was "undetermined"). Nevertheless, Dr. Beyler and Mazza disagreed on several points concerning the reliability of Doran's fire investigation.[43]
Dr. Beyler's Findings
            Dr. Beyler believed that Doran's conclusions are flawed for at least three other reasons. First, Dr. Beyler opined that ignition of the stack of newspapers could not have caused the fire because: (a) Lt. Bennett of the BFD was able to kick the stack of newspapers aside and could only have done so if the twine used to tie the bundle together was still present, yet twine would have burned before the newspapers; and, (b)
 
--------------------------------------------
 
[42] The first version of the NFPA Guide, which was released in 1992, dispelled the myth of "alligatoring."
[43] Neither party challenged the qualifications of Dr. Beyler and Mazza as fire investigators.
 
                                                            -31-
 
the stack of newspapers could not have been a sufficient fuel source to cause the amount of fire damage present in the front alcove.
            Second, Dr. Beyler challenged Doran's exclusion of an electrical malfunction as a possible cause of the fire because, by focusing solely on the absence of overheated copper wiring due to overloading, which Doran ruled out because the copper wiring in the front alcove lacked brittleness, Doran ignored other more prevalent possible electrical fire initiation scenarios. Moreover, in excluding an electrical cause for the fire, Doran focused solely on the front alcove and failed to consider an electrical cause in other areas of the Building.
            Third, Dr. Beyler contested Doran's conclusion that there was no evidence of drop down burning in the front alcove that could have caused the lowest point of burning, a consideration required by the NFPA Guide when determining the area of origin.[44] During the first trial, while referring to photographs of the alcove, Doran testified that the ceiling area of the alcove "was intact for the most part" and showed no evidence of drop down burning. However, Dr. Beyler points to photographs of the fire damage in the front alcove that show that the ceiling overhang above the alcove had completely burned away and a structural part of the ceiling is seen hanging down. Dr. Beyler believes, therefore, that drop down burning in the front alcove area could not be eliminated as the cause of the lowest point of burning in the alcove, which Doran claimed was the point of origin of the fire.
            Dr. Beyler ultimately concluded that the area of origin of the fire was the overhead area of the front alcove because it was far more extensively burned than the
 
--------------------------------------------
 
[44] The NFPA Guide defines "drop down" burning as "[t]he spread of [f]ire by the dropping or falling of burning materials. Synonymous with Fall Down." M. Ex. 12, 1J 3.3.50.
 
                                                            -32-
 
alcove walls. He further concluded that he could not determine the cause of the fire because of flaws in Doran's investigation, including Doran's failure to adequately rule out an electrical source.
Michael Mazza's Findings
            Mazza agreed with Tpr. Bradbury's finding that the Protected Area was the area of origin of the fire. He also agreed with Doran's opinion that the Protected Area was the point of origin.
            Mazza also agreed with Doran's and Tpr. Bradbury's determinations that drop down burning did not cause the lowest point of burn they observed at the bottom of the alcove wall because there was no heat source above the alcove, such as a light fixture, that could have overheated. He further agreed with Doran's and Tpr. Bradbury's findings that an electrical fire can be ruled out as a cause of the fire because the only wiring observed in the front alcove after the fire, which is visible in photographs, was part of a low voltage fire alarm system that would not typically cause a fire when it malfunctions.
            Mazza concluded that the cause of the fire was an open flame applied to the side of the newspapers while the stack was propped up against the wall with the side of the newspapers facing up, thus creating the Protected Area.[45]
            According to Mazza, the flames then spread up the wooden wall in the front alcove (which, in his opinion, easily ignited due to the presence of paint on the wall), through the transoms over the exterior metal door, into the interior of the first floor of the Building, and then up the stairwells to the second and third floors of the Building.
 
--------------------------------------------
 
[45] Mazza concluded that the stack of newspapers was not lying flat on the ground when ignited with the open flame because it would not have sufficiently "flamed-up."
 
-33-
 
            As stated, Mazza disagreed with Doran's conclusion that a flammable liquid was used as the ignition source for this fire because there was no evidence of the presence of a flammable liquid near the area of origin. Thus, like Dr. Beyler, Mazza cannot say whether or not a liquid accelerant was used, i.e., the presence of a flammable liquid is undetermined.
D. POST-TRIAL DEVELOPMENTS IN THE SCIENCE OF EYEWITNESS IDENTIFICATION AND MEMORY
            As stated, Carver called Dr. Franklin, who has a Ph.D. in Psychology from Stanford University, as a witness at the hearings on the Motion.
Dr. Franklin Is Qualified To Testify As An Expert In The Science Of Eyewitness Identification And Memory
            Until 2019 when she retired, Dr. Franklin was an Associate Professor of Psychology at Stony Brook University in New York for 30 years. Her expertise has long focused on the science of memory, cognition, and memory errors. Her expertise extends to the subject of eyewitness identification science.
            Dr. Franklin has testified dozens of times in quite a few states, including Massachusetts, as an expert in the area of eyewitness identification and memory.
            At bottom, the Court has little difficulty in ruling that Dr. Franklin is qualified to testify as an expert in the science of eyewitness identification and memory, and the evolution of the scientific principles and the underlying research.
The Science Of Eyewitness Identification And Memory Has Evolved Significantly Since Carver's Trial In 1989
            According to Dr. Franklin, research into eyewitness identification and memory began in the 1970s, but significantly grew and accelerated after Carver's trial in November 1989.
 
                                                            -34-
 
            Since the trial, there is consensus in the scientific community that human memory does not work like a videorecorder. Rather, the research has demonstrated that the brain's informational encoding and recall processes are flawed. For example, people routinely retrieve factual details that were successfully encoded in the brain based on an eyewitness experience, even as they recall details that are "filled in" by inference and incorporated from other external sources. The research has demonstrated that this phenomenon of memory reconstruction generates a significant risk that people will introduce factual errors into a recollection. Consequently, it is now understood that the accuracy of an eyewitness identification depends on how well the brain initially encodes the memory of the appearance of a person's face, and the extent that post-event influences are introduced to that memory.
Dr. Franklin Opined That Several Factors Made Stanley Clark's Identification Of Carver Unreliable
            Dr. Franklin opined that the impact of numerous factors demonstrate the unreliability of Clark's identification of Carver as the suspect (and his identification of Carver's Mercury Cougar as a car parked adjacent to the Building at the time of the fire).[46] The Court will address seven of these factors.
            First, according to Dr. Franklin, research has shown that people are particularly poor at remembering faces, especially faces of a stranger with whom they are unfamiliar. In this case, Clark did not know Carver and had never seen him before the day of the fire.
 
--------------------------------------------
 
[46] Although Dr. Franklin reached conclusions that challenge the accuracy of identification evidence introduced through Michaud and Eastman, the Court will focus solely on the evidence regarding Clark's identifications because he offered the only evidence at the trial which directly placed Carver at the scene. To be sure, as is explained below, the testimony of Michaud and Eastman in this area benefitted Carver.
 
                                                            -35-
 
            Second, the risk of misidentification significantly increases each time a witness is exposed to a suspect or the suspect's photograph, which has become known as the
"mugshot exposure effect."[47]   [48]
            Here, Clark was exposed to Carver's photograph three times during the serial photo array procedures conducted by police, which were conducted over almost three and one-half years (between August 1984 and January 1988) before he selected Carver during an in-person lineup procedure in April 1988.
            To be sure, Clark was exposed to Carver's face five times before he identified Carver at the trial, i.e. during three photo array procedures, the in-person lineup, and at the first trial. According to Dr. Franklin, research has shown that repeated exposures to a suspect's appearance by a witness produces a sense of familiarity, which can trigger false memory. Here, not only was Clark exposed to Carver's appearance five times before identifying him during the second trial, his exposure to Carver's appearance during the first trial was lengthy. Clark's testimony occurred over two days and covers 140 pages of the trial transcript.
 
--------------------------------------------
 
[47] In fact, in 2015 in Commonwealth v. Gomes, 470 Mass. 352 (2015), the SJC discussed this factor, observing that:
A prior viewing of a suspect in an identification procedure raises doubts about the reliability of a subsequent identification procedure involving the same suspect.... "[S]uccessive views of the same person can make it difficult to know whether the later identification stems from a memory of the original event or a memory of the earlier identification procedure."
Id. at 375 (citations omitted).
[48] As for the mugshot exposure effect, the SJC stated in Gomes that "[a] meta-analysis [in 2006] of eleven published articles showed that 'prior mugshot exposure decreases accuracy at a subsequent lineup, both in terms of reductions in rates for hits and correct rejections as well as in terms of increases in the rate for false alarms."' Id. at 375- 376 (citation omitted).
 
                                                            -36-
 
            In sum, the Court has little difficulty in finding that, after being exposed to Carver's appearance for a fifth time, Clark had a sense of familiarity with Carver's appearance at the trial.
            Third, the reliability of an identification falls when a witness's memory becomes contaminated by things, such as repeated identification procedures, and police interactions and feedback (i.e., "memory contamination").
            According to Dr. Franklin, the instructions given to Clark by the Commonwealth at the beginning of the in-person lineup procedure, i.e., that Clark was to see whether any of the men in the lineup were the man "who you saw standing outside of the Elliott Chambers ... wearing bib overalls," contaminated Clark's memory of the suspect and introduced bias in favor of Clark making an identification.
            The significance of the reminder that the suspect wore bib overalls and the potential for contamination of Clark's memory warrants further discussion. Clark was told at the very beginning of the lineup that the "purpose [is to determine] ... whether or not you believe any of the men in the group is the man who you saw standing outside of the Elliott Chambers on July 4th, at about 4:00 in the morning wearing bib overalls." (emphasis added). He was then told to write down the applicable lineup number if he saw "the person who is standing in front of the Elliott Chambers ... wearing bib overalls." (emphasis added).
            The Court finds that twice reminding Clark that the suspect wore bib overalls and telling him that "the purpose" of the lineup was to see if the man in the bib overalls was in the lineup, significantly and unnecessarily increased the risk of contaminating Clark's memory of the suspect's appearance.
 
                                                            -37-
 
            Furthermore, Clark's memory was arguably further contaminated during the first trial in the following manner. When asked by the prosecutor what the suspect was wearing at the time he saw him, Clark answered "[h]e was wearing overalls," not "bib" overalls. Nevertheless, later the prosecutor reminded Clark that they were, in fact, bib overalls when asking Clark "whether the area in which you saw that person with the bib overalls that you described is shown [in a photograph of the scene]."[49]
            Moreover, the risk of memory contamination through intentional or unconscious signaling by police increases when a non-blind identification procedure is used (e.g., in the case of a photo array procedure, where either the administrator or an attendee during the procedure knows the identity of the target suspect). Here, the in-person lineup, and the second and third photo array procedures were "non-blind."
            Fourth, Dr. Franklin cites memory decay, which is the deterioration of information stored in memory over time, as a factor in the unreliability of Clark's identification of Carver. The first time Clark spoke with the police and first attempted to describe the appearance of the suspect was on July 13, 1984, nine days after he observed the suspect. Additionally, the police did not conduct the first photo array procedure with Clark until August 21, 1984, seven weeks later, and Clark did not participate in the in- person lineup procedure until April 21, 1988, almost four years after the fire.
            Fifth, according to Dr. Franklin, research has demonstrated that decision latency, which is the length of time it takes a witness to make a selection during an identification procedure, is a factor in the accuracy of an identification. Simply put, the longer it takes
 
--------------------------------------------
 
[49] It cannot be overstated how important it was to the Commonwealth's case that the only person that put Carver at the scene just before the fire saw the suspect wearing the exact type of clothing that Carver told (and gave) the police he wore during the hours before the fire.
 
                                                            -38-
 
for a witness to make a selection during an identification procedure, the more likely the identification is inaccurate.[50]
            Sixth, Dr. Franklin cites filler identification, which is when a witness selects a filler during an identification procedure, as an indicator of the unreliability of a witness's identification. According to Dr. Franklin, this demonstrates the witness's inability to uniquely identify the suspect due to a poor memory of the suspect's appearance. Here, Dr. Franklin points to Clark's simultaneous selection of the photograph of a filler during the array procedure as having a closer depiction of the suspect's hair length "or" hairstyle than that depicted in Carver's photograph.
            Seventh, according to Dr. Franklin, research has shown that a witness's level of certainty of their identification of a suspect grows with time when, like Clark, the witness is repeatedly exposed to investigator feedback and information about the investigation, whether the feedback and information were deliberately, unintentionally, or unconsciously provided to the witness. Similarly, research has shown that a witness's level of certainty of their identification of a suspect is a poor predictor of its accuracy.
            Here, at trial, Clark conceded that his memory of the suspect's appearance grew with time as he met with investigators. Nevertheless, when asked during re-direct examination what he told the officers at the first Photo Array procedure in California
 
--------------------------------------------
[50] In Carver's submissions, he argues that it took Clark twenty minutes to examine the first photo array before selecting his photograph. However, the Court's memory of Dr. Franklin's testimony at the Motion hearing regarding the length of Clark's decision latency (i.e., twenty minutes) is foggy, at best, and it could not otherwise find evidence in the record regarding the length of the decision latency. Nevertheless, the Court credits Dr. Franklin's testimony that research has shown that a decision latency of more than 30 seconds by a witness is at the "chance level" and a truly reliable decision is made within seconds.
 
                                                            -39-
 
when he selected the suspect's photograph, Clark replied that what he told them "exactly" was "[y]es, I'm sure that this is the guy."
CONCLUSIONS  OF LAW
            In the Motion, Carver argues that certain advances in fire and eyewitness science since the trial in 1989 amount to sufficient newly discovered evidence which warrant the granting of a new trial.[51]
            I. THE LEGAL FRAMEWORK
            A trial court may grant a new trial "at any time if it appears that justice may not have been done." Mass. R. Crim. P. 30(b).
            "The defendant has the burden of proving facts upon which he relies in support of his motion for a new trial." Commonwealth v. Chatman, 466 Mass. 327, 333 (2013) (citation omitted).
            When deciding a motion for new trial, the Court must keep in mind four general principles. First, "[m]otions for a new trial are granted only in extraordinary circumstances." Commonwealth v. Comita, 441 Mass. 86, 93 (2004) (citation omitted); see also Commonwealth v. Lopez, 96 Mass. App. Ct. 34, 38 (2019) ("'A strong policy of finality limits the grant of new trial motions to exceptional situations, and such motions
 
--------------------------------------------
 
[51] In his Supplemental Memorandum, Carver advanced two additional theories in support of the Motion. First, that his trial counsel had engaged in significant personal and professional misconduct, which, inter alia, caused counsel to have a prejudicial conflict of interest. Second, that the jury was "unaware" that a witness, Florence Michaud, identified a resident of the ECRH as the perpetrator. See Paper No. 172, pp. 24-42. Not to be outdone, in his Post-Hearing Reply, Carver advanced two more additional theories in support of the Motion. First, that the failure to present Michaud's identification of a third-party culprit at trial amounted to constitutionally ineffective assistance of counsel. See Paper No. 184, pp. 32 - 33. Second, that the Commonwealth violated Carver's federal and state right to due process by allegedly failing to disclose evidence of Michaud's identification of a third-party culprit and the police investigation into same. See Paper No. 184, pp. 33 - 36. The Court declines to address these issues given its ruling, infra, granting Carver a new trial based on other theories.
 
                                                            -40-
 
should not be allowed lightly."') (citations omitted). Second, "the principle of finality of convictions remains a valuable and important concept in our jurisprudence." Rosario, 477 Mass. at 77 (citations omitted).
            Third, '"[a] defendant is entitled to a fair trial but not a perfect one, for there are no perfect trials."' Commonwealth v. Brescia, 471 Mass. 381, 391 (2015) (citations omitted). Fourth, "[t]he judge [] must focus on the probable effect of the circumstances on the jury's decision-making, and not on his or her own 'personal assessment of the trial record,' ... in order to 'preserve[] ... the defendant's right to the judgment of his peers."' lg. (citations omitted).
            With these general principles in mind, the Court will address the merits of the Motion.
II. A NEW TRIAL MUST BE GRANTED BECAUSE CERTAIN ADVANCES IN FIRE SCIENCE SINCE CARVER'S TRIAL IN 1989 ARE NEWLY DISCOVERED AND CAST REAL DOUBT ON THE JUSTICE OF HIS CONVICTIONS
            In the Motion, Carver first argues that he should be granted a new trial because certain advances in fire science described by Dr. Beyler qualify as newly discovered evidence and show that Doran's testimony at the trial regarding the origin and cause of the fire was flawed and unreliable, and undermine Carver's incriminating statements to Coletti that he set the fire by pouring gasoline on newspapers, the lynchpin of the Commonwealth's case at trial.
            For its part, the Commonwealth agrees that Doran's testimony at the trial regarding certain conclusions he reached during his fire investigation have since been deemed unreliable due to advances in fire science. However, the Commonwealth contends that a new trial is not warranted because some of Dr. Beyler's conclusions
 
                                                            -41-
 
regarding the flaws in Doran's investigation are not based on advances in fire science and, in any event, the jury would not have reached a different result had Dr. Beyler's fire investigation testimony been admitted at the trial.
            "To prevail on a motion for a new trial based on newly discovered evidence, a defendant must meet the two-prong test set forth in Commonwealth v. Grace, 397 Mass. 303, 305 (1986). The defendant must establish, first, that the evidence is 'newly available' or 'newly discovered' and, second, that the evidence 'casts real doubt' on the justice of the conviction." Commonwealth v. Lessieur, 488 Mass. 620,627 (2021) (Lessieur II) (citations omitted); see also Commonwealth v. Duguay, 492 Mass. 520, 531 (2023) ("Where the defendant's motion for a new trial is based on new evidence, the defendant must demonstrate that (1) the evidence is either 'newly discovered' or 'newly available,' and that (2) it 'casts real doubt' on the justice of the defendant's conviction.") (quotations and citations omitted); Commonwealth v. Johnson, 486 Mass. 51, 67 (2020) (same).[52]
 
--------------------------------------------
 
[52] It is the view of the Court that the SJC has applied various formulations of the elements (or, "prongs") for a motion for new trial based on newly discovered evidence, such as that a defendant must establish three elements, rather than two. See e.g., Commonwealth v. Moore, 489 Mass. 735, 749 (2022) ("To be entitled to a new trial based on newly discovered evidence, a defendant must establish that [(1)] evidence is, in fact, newly discovered, and must show [(2)] that the new evidence is 'material and credible' and that [(3)] 'there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial."'). To be sure, in a recent decision, the SJC simply stated that, "[i]n order for a motion for a new trial predicated on newly discovered evidence to succeed, a defendant must establish prejudice or materiality." Commonwealth v. Gaines, 494 Mass. 525, 539 (2024) (emphasis added).
 
                                                            -42-
 
A. Four Conclusions Reached By Dr. Beyler Are Based On Advances In Fire Science Since Carver's Trial In 1989 And Qualify As "Newly Discovered Evidence"
            The Court must first determine whether advances in fire science since the trial in 1989 qualify as newly discovered evidence and, if so, the precise contours or scope of the advances in fire science that are pertinent to the evidence presented at the trial. To do so, the Court must closely examine Dr. Beyler's conclusions and determine whether they are, in fact, based on advances in fire science.
            Carver contends that four of Dr. Beyler's opinions are based on his application of advances in fire science to the fire investigation of the ECRH fire. The Court will address each such opinion in turn.
1. Dr. Beyler's Conclusion That The Point Of Origin Of The Fire Must Be Deemed Undetermined Is Based On Advances In Fire Science And, Thus, Qualifies As "Newly Discovered Evidence"
            First, Dr. Beyler concluded that the point of origin of the fire must be deemed undetermined and that it is not the Protected Area as Doran claimed at the trial, because Doran's conclusion was based on the since-repudiated principle that fires do not burn downward and that the lowest point of burn is always the point of origin of a fire.
            For its part, the Commonwealth points to Mazza's ability to determine the same point of origin as Doran using modern fire science standards. The Commonwealth further argues that Dr. Beyler's inability to determine the point of origin has little to do with scientific advances; rather, it is nothing more than a differing opinion that is "hampered by" the "imperfect" nature of the forty year-old fire investigation information Dr. Beyler relied on.
 
                                                            -43-
 
            There is little dispute that, since the trial in 1989, there have been significant advances in fire science that resulted in the promulgation, for the first time, of formal standard fire investigation practices and procedures, beginning with the first edition of the NFPA Guide in 1992. To be sure, the adoption of the scientific method for fire investigations in 1992 in the NFPA Guide resulted in a far different methodology than the approach Doran described using at the second trial, which was that he began his analysis by determining the point of origin.[53] Furthermore, and most importantly, the debunking of the paramount significance Doran placed on the lowest point of burn in determining the point of origin is a considerable advancement in fire science.[54]
            At bottom, the Court rules that Dr. Beyler's opinion that the point of origin of the fire must be deemed undetermined is based on advances in fire science since the 1989 trial and, thus, "is, in fact, newly discovered." Moore, 489 Mass. at 749.
--------------------------------------------
 
[53] At the first trial, unlike during the second trial, Doran described the steps he took in investigating the ECRH fire. First, after touring the scene, he tried to determine the path the fire travelled and "tr[ied] to walk it back to the area that would be eventually the area of origin of the fire." Next, he looked at and eliminated accidental causes of the fire. Then, he located the point of origin. Lastly, Doran applied "good judgment [to] com[e] up with a cause at the point of origin." Doran's testimony before the Grand Jury regarding the steps he typically took during a fire investigation was similar.
[54] The Commonwealth argues that Doran's elimination of drop down burning shows that he did not rely exclusively on the now-repudiated principle that the lowest point of burn is the point of origin of the fire. Nevertheless, Doran's emphasis at the second trial on the lowest point of burn cannot be overstated.
 
                                                            -44-
 
2. Dr. Beyler's Conclusion That The Area Of Origin Of The Fire Was The Ceiling And Space Above The Front Alcove Is Based On Advances In Fire Science And, Thus, Qualifies As "Newly Discovered Evidence"
            The second opinion reached by Dr. Beyler that Carver asserts is based on his application of advances in fire science is Dr. Beyler's opinion that the area of origin of the fire was the ceiling and space above the front alcove, and not the floor and lower area of the alcove. He based this opinion on the amount of fire damage in the overhead area, which was significant, especially when compared to the more limited nature of the fire damage to the alcove walls above the Protected Area.
            For many of the same reasons that the Court ruled that Dr. Beyler's opinion about the point of origin is based on advances in fire science (e.g., adoption of the scientific method), the Court rules that Dr. Beyler's opinion regarding the location of the area of origin of the fire is based on advances in fire science since the 1989 trial and "is, in fact, newly discovered." ]Q.
3. Dr. Beyler's Conclusion That The Cause Of The Fire Must Be Deemed Undetermined Is Based On Advances In Fire Science And, Thus, Qualifies As "Newly Discovered Evidence"
            The third opinion reached by Dr. Beyler that Carver asserts is based on his application of advances in fire science is his conclusion that the cause of the fire must be deemed undetermined, and not the intentional ignition of a bundle of newspapers that had been doused with a flammable liquid, as Doran told the jury.
            For his part, Mazza disagrees with two of Doran's conclusions regarding the cause of the ECRH fire. First, like Dr. Beyler, Mazza disagrees with Doran's conclusion that a flammable liquid must have been used as an ignition source because there was
 
                                                            -45-
 
no evidence at the fire scene to support it. Second, Mazza disagrees with Doran's opinion that an accelerant must have been used because, in Doran's opinion, it was not possible to ignite the bundle of newspapers with only an open flame. Rather, Mazza believes that the cause of the fire was the direct application of a flame to the side of the newspapers in the stack.
            The Commonwealth points to Tpr. Bradbury's findings in 1984 in which he concluded, like Mazza, that the cause of the fire was direct heat applied to newspapers; thus, the Commonwealth argues that the dispute about the cause of the fire is not based on new fire science. The Commonwealth also argues that neither Tpr. Bradbury nor Mazza excluded the use of a flammable liquid.
            The Commonwealth's arguments minimize or ignore three important factors. First, at the second trial, Doran testified that he reached the conclusion that a flammable liquid was used to ignite the fire based on two principles that Dr. Beyler and Mazza agree have been discredited by the fire science community since; i.e., the presence of a shiny "alligatoring" char pattern on the wall above the Protected Area and the "smoke swirl" pattern on an adjoining formica-coated wall in the front alcove.
            Second, while it is true that Tpr. Bradbury did not explicitly exclude the use of a flammable liquid in setting the fire, he barely mentioned flammable liquid, at all, in his report. Thus, the absence of Tpr. Bradbury expressly excluding the possibility of a flammable liquid being used as an accelerant is meaningless and ignores that Dr. Beyler and Mazza agree that whether or not a flammable liquid was used to ignite the fire could not be determined (i.e., it was "undetermined").
 
                                                            -46-
 
            Third, as evidenced by his description of how he conducted his investigation, including his statement at the first trial that a fire investigation "is done as a process of elimination," Doran relied on negative corpus reasoning in concluding that the fire was intentionally set, a principle that was expressly rejected by the fire science community beginning in the 2011 edition of the NFPA Guide.
            In sum, the Court rules that Dr. Beyler's opinion that the cause of the fire must be deemed undetermined and not the ignition of a flammable liquid is based on advances in fire science since the 1989 trial and, thus, "is, in fact, newly discovered." Moore, 489 Mass. at 749.
4. Dr. Beyler's Conclusion That An Electrical Malfunction Cannot Be Ruled Out As The Cause Of The Fire Is Based On Advances In Fire Science And, Thus, Qualifies As Newly Discovered Evidence
            Finally, the fourth opinion reached by Dr. Beyler that Carver asserts is based on his application of advances in fire science is Dr. Beyler's conclusion that, contrary to Doran's testimony at the trial, an electrical source could not be ruled out as the cause of the fire.
            For its part, the Commonwealth argues that Dr. Beyler's criticism of Doran's electrical fire investigation as being significantly incomplete is not based on new fire science, methodologies, or protocols, and fails to consider Doran's testimony at the first trial where he explained his electrical investigation in more detail than during the second trial.
            During the first trial, Doran testified that, in addition to his inspection regarding the flexibility and brittleness of the wiring that he observed in the front alcove, he also inspected the wiring for other signs of overloading, such as arcing, beading ("little wire
 
                                                            -42-
 
bubbles on the end where the shorts would occur"), and melting at different diameters. However, this testimony fails to address Dr. Beyler's main criticisms of Doran's ruling out an electrical malfunction as the cause of the fire, namely: (a) Doran did not consider potential electrical causes beyond overloading and areas of the Building other than the front alcove; and, (b) the absence of brittleness (and the presence of flexibility) in copper wiring after a fire means that the wiring did not overheat because of overloading.
            The Court recognizes that Dr. Beyler did not point to a specific provision in the NFPA Guide or describe specific advances in fire science to support his criticisms of Doran's electrical fire investigation. Nevertheless, the record evidence is clear that Doran, Tpr. Bradbury, and Harris limited their consideration of an electrical source as the cause of the fire to the front alcove (and, in the case of Tpr. Bradbury, to the floor of the front alcove) and did so because they believed that was the location of the lowest point of burn and, hence, the point of origin of the fire. In other words, the investigation in 1984 of a possible electrical cause of the fire was based on the principle that the lowest point of burn is always the point of origin, which has since been rejected by the NFPA Guide.
            Therefore, the Court rules that Dr. Beyler's opinion that an electrical malfunction cannot be ruled out as the cause of the fire is based on advances in fire science since the 1989 trial and, thus, "is, in fact, newly discovered." Moore, 489 Mass. at 749.[55]
 
--------------------------------------------
 
[55] Some decisions by the SJC in this area have also required the defendant to prove that the newly discovered evidence is material and credible. See Commonwealth v. Lessieur, 472 Mass. 317,331 (2015) (Lessieur I) ("The [new] evidence 'must be material and credible."'); Grace, 397 Mass. at 305 ("The evidence said to be new ...  must be material and credible . . . ").
            Here, as to whether the aforementioned four "newly discovered" conclusions expressed by Dr. Beyler (and the conclusions reached by Mazza) are material, the parties have not cited,
 
                                                            -48-
 
B. Dr. Beyler's "Newly Discovered" Conclusions About The Origin And Cause Of The ECRH Fire Cast Real Doubt On The Justice Of Carver's Convictions Because They Would Probably Have Been A Real Factor In The Jury's Deliberations
            Left for the Court's consideration is whether Carver's "newly discovered" advances in fire science satisfies the aforementioned second prong of "the two-prong test set forth in Commonwealth v. Grace, 397 Mass. 303, 305 (1986) ... , that the evidence 'casts real doubt' on the justice of the conviction." Lessieur II, 488 Mass. at 627.
            In Gaines, the SJC recently described this second prong or element as follows:
In order for a motion for a new trial predicated on newly discovered evidence to succeed, a defendant must establish prejudice or materiality . . . A defendant establishes prejudice by establishing that the evidence "would probably have been a real factor in the jury's deliberations," such that its absence "casts real doubt on the justice of the conviction."
Gaines, 494 Mass. at 539 (citation omitted) (emphasis added).
            The SJC in Gaines further observed that:
In analyzing the prejudice to the defendant, "[w]e need not determine ... whether the defendant would be found not guilty were [expert evidence] presented." ... Indeed, we recognize that in his third motion for a new trial, the defendant inculpated himself in an effort to reduce his sentence. However, because the new eyewitness identification research that has emerged since trial "demonstrate[s] the [necessary) materiality, weight, and significance," ... , and because of the myriad errors in the
 
--------------------------------------------
 
and the Court has not found, reported decisions that have addressed the materiality element in any detail. Nevertheless, the Court has little difficulty in ruling that the newly discovered evidence meets the common definition of "material," i.e., "having real importance or great consequences." Merriam-Webster Online Dictionary, https://www.merriam- webster.com/dictionary/material (last accessed December 20, 2024). Further, the Court has little difficulty ruling that the aforementioned four "newly discovered" conclusions expressed by Dr. Beyler (and the conclusions reached by Mazza) are credible. There is no dispute that Dr. Beyler and Mazza are recognized experts in fire investigations and have been conducting fire investigations long enough to recognize the pertinent changes in fire science since the trial in 1989. The Court found the testimony and conclusions of Dr. Beyler and Mazza to be credible.
 
                                                            -49-
 
identification process, ... we conclude that the motion judge did not abuse her discretion in finding that this newly discovered evidence would probably have been a real factor in the jury's deliberations.
Id. at 540 - 541 (citations omitted) (emphasis added).
            Thus, according to the SJC's reasoning in Gaines, the narrow issue for the Court's determination is "not whether the verdict would have been different, but rather whether [Dr. Beyler's aforementioned four opinions regarding the origin and cause of the ECRH fire that are based on advances in fire science] would probably have been a real factor in the jury's deliberations." Grace, 397 Mass. at 306.[56]
            Here, Carver argues that developments in fire science would have been a real factor in the jury's deliberations because the new science: (a) conclusively shows that the Commonwealth's theory at the trial regarding the point of origin (i.e., the Protected Area) and cause (i.e., the intentional setting of a stack of newspapers on fire with a flammable liquid) were wrong; and, (b) "completely undermine[d]" his incriminating statements to Coletti, a significant piece of inculpatory evidence at the trial.[57]
 
--------------------------------------------
 
[56] The standard set forth in Moore and Grace, i.e., whether the new evidence would probably have been a real factor in the jury's deliberations, is arguably a lower standard than that expressed by the SJC in other cases such as Duguay. that the '"[n]ew evidence will cast real doubt on the justice of the conviction if there is a substantial risk that the jury would have reached a different conclusion had the evidence been admitted at trial."' Duguay. 492 Mass. at 531 (citation omitted) (emphasis added); see also Commonwealth v. Cowels, 470 Mass. 607, 608 (2015) ("we believe that there is a substantial risk that, had the newly available DNA testing been available at the time of the trial ... , the outcome of the trial would have been different. The defendants, therefore, must receive a new trial.") (emphasis added).
[57] Carver also argues, without citation to any legal authority, that advances in fire science would have been a real factor in the jury's deliberations because "it would have completely changed the defense trial strategy," which included: (a) not contesting that the fire was arson (intentionally set); (b) not calling a fire expert to refute Doran's findings; and, (c) chalking up his incriminating statements to Coletti as a cry for help. However, the Court is not convinced that what Carver's trial strategy would have been if he had the newly discovered fire science evidence at trial is relevant to the Court's determination. Cf. Commonwealth v. Tavares, 491
 
                                                            -50-
 
            For its part, the Commonwealth minimizes the significance of Doran's use of discredited principles in determining the place of origin and cause of the fire, and points to the "undisputed evidence" at trial that otherwise showed that the fire was likely set on the floor of the alcove by igniting the stack of newspapers. More specifically, the Commonwealth cites evidence that Eastman delivered a stack of newspapers to the front of Davis drugstore, some distance away from the Building's front alcove, and, a short time later, Lt. Bennett came across (and kicked away) a burnt stack of newspapers on the floor of the alcove at the Protected Area.
            Moreover, the Commonwealth argues that the "cornerstones" of its case at trial were not the fire science; rather they were the incriminating statements made by Carver that showed he had a motive to light the fire (i.e., jealousy of Nickerson's budding relationship Lisa), threatened to do so earlier that evening (i.e., during his confrontation with Nickerson), and admitted setting the fire on three separate occasions (i.e., to the Project Rap personnel, Coletti, and Smialek).
1. The Commonwealth's Case At Trial Emphasized Doran's Faulty Fire Investigation Opinions
            The Commonwealth's theories at the trial regarding the origin and cause of the fire, which were based exclusively on Doran's testimony, are significantly undermined by two crucial undisputed advances in fire science. First, that the point of origin of the fire was the Protected Area because that was the lowest point of burn and fires don't burn downward. Second, that the presence of "alligatoring" on the alcove wall above the
 
--------------------------------------------
 
Mass. 362, 368 (2023) (rejecting Commonwealth's argument that third party culprit evidence that trial counsel failed to investigate was immaterial because it would have supported that defendant acted in a joint venture with the third party, rather than alone, because "what otherwise might have happened if the case had been tried differently is purely speculative.").
 
                                                            -51-
 
Protected Area and "smoke swirls" on the Formica-covered alcove wall nearby meant that a flammable liquid was used to ignite the fire. Furthermore, as to the second scientific advancement, there is no dispute (because Dr. Beyler and Mazza agree) that when applying advances in fire science, the use of a flammable liquid ignition source must be considered undetermined.
            It is an understatement to say that these and other advances in fire science, e,g., Doran's use of the since-prohibited negative corpus reasoning and the absence of the application of the since-mandated scientific method during his investigation, undermine the Commonwealth's sole theory at the trial regarding the origin and cause of the fire, i.e., that Carver carried the stack of newspapers from the Davis drugstore to the alcove, and set the fire by placing it against the wall on the floor of the front alcove, pouring a flammable liquid on it, and setting the liquid on fire with a match.
            That theory was prominent in the Commonwealth's opening statement and closing argument. For example, during the very first meaningful sentence of its opening statement, the Commonwealth emphasized its theory of the origin and cause of the fire, as follows:
[Carver] willfully and maliciously set a fire at the building, ... that he did so by taking a stack of newspapers, pouring in an accelerant, a flammable substance on it, lighting an open match to it, and set a rooming house on fire there, causing a conflagration, an inferno in which fifteen people ... were murdered.
Tr. 2, Vol. 2, p. 50 (emphasis added).
            Later in its opening statement, the Commonwealth dovetailed its theory of the origin and cause of the fire with the evidence it expected to present:
Harold Eastman ... deliver[ed] a pile of newspapers to the corner to the Davis Drug Store. After that, ... this defendant takes those
 
                                                            -52-
 
newspapers, sets them in front of the doorway up against some wood in an alcove, the entrance way to the doorway to the Elliott Chambers, and,... he pours an accelerant, a flammable substance, on the newspapers and sets the place on fire.
Tr. 2, Vol. 2, p. 58 (emphasis added).
            Near the beginning of its closing argument, the Commonwealth emphasized its theory regarding the origin and cause of the fire, claiming that, unlike in his opening statement, Carver conceded in his closing argument that "it was an arson fire," as follows:
Now, in his final argument[, the defendant] indicat[ed] that the fire probably didn't start where the government said it did, here where Fire Marshal Doran told you in his expert opinion it started, in the right hand-corner of the alcove. But, in any event, he admits that it was an arson fire.
Tr. 2, Vol. 12, p. 52 (emphasis added).
            Later in its closing argument, the Commonwealth again stressed the significance of Doran's now-discredited expert conclusions:
You heard the firefighters describe the path that the fire took by use of the slides and their oral testimony, where the fire first was overlapping in the building and how it all came back to one point of origin, one point of origin in that alcove where the green paint is showing in the lower right-hand corner, and Marshal Doran told you that the person that lit that fire could not have just taken a ma[tch] and held it to that stack of newspapers because that would be akin to taking a match and trying to light a log. He said some accelerant would have to be used -- and an accelerant, members of the jury, you heard testimony there is an accelerant, gasoline, and it is a volatile accelerant; and the defendant had access to gasoline you learned because he and Coletti had that informal business, that grass-cutting business together.
Tr. 2, Vol. 12, pp. 52, 68 - 69 (emphasis added).
            In contrast, in Carver's opening statement, which he delayed until the Commonwealth rested its case on the seventh day of evidence (after calling 23
 
                                                            -53-
 
witnesses), Carver conceded that the fire was the product of arson and characterized his view of the case against him as "strictly a case of whether [he] was at Elliot Chambers at the time that the fire was lit and whether, if he was at Elliott Chambers on July 4th, 1984, he is the one that caused the fire." Tr. 2, Vol. 8, p. 40.[58] However, in his closing argument, Carver argued that the fire did not start in the alcove; rather, it started on the other side of the front entrance door, in the interior hallway where the MSP chemist, Hankard, found the only evidence of the presence of a flammable liquid. Tr. 2, Vol. 12, p. 33- 34.
2. At Trial, The Commonwealth Emphasized How Doran's Findings Supported Coletti's Testimony Regarding Carver's Incriminating Statements
            In its closing argument, the Commonwealth pointed to Doran's findings to emphasize how they dovetailed with Carver's incriminating statements to Coletti in October 1984, as follows:
[Carver told Coletti that,] I've hurt people. I've hurt a lot of people. I lit the fire      and with some detail he tells her. He takes the newspapers. Well, we know where those newspapers came from, members of the jury. They came from the drugstore and he puts them in the doorway and then he poured gasoline. And [Coletti] knew he had gasoline in the trunk of the car, a little red teapot, a little kind of gasoline container. He lit the match and he left.
Tr. 2, Vol. 12, p. 79 (emphasis added).
            In contrast, in his closing argument, Carver conceded that he made the statements to Coletti, "[a] valued friend," but argued that, after weeks of public suspicion that he was the arsonist, he did so as a "cry[] out for help." This concession was the
 
--------------------------------------------
 
[58] The record is missing four pages of the transcript of Carver's opening statement.
 
                                                            -54-
 
product of Carver's cross-examination of Coletti during which he emphasized Coletti's observations of his emotional state at the time and did not attempt to impeach her.
            Given the state of fire science at that time, when fire investigators uniformly relied on observations of the lowest point of burn and alligatoring, and negative corpus reasoning, Carver had no basis to challenge the accuracy of Doran's fire investigation, (other than the sample of accelerant found inside the hallway). This further explains Carver's timid cross-examination of Coletti, and his overall strategy in focusing on challenging the identification and motive evidence. The "newly discovered" fire science conclusions reached by Dr. Beyler, e.g., the area of origin was the ceiling, not the floor, of the alcove, would certainly have given Carver ammunition to more vigorously challenge Coletti's testimony.
3. The Overall Strength Of The Evidence Against Carver Would Not Have Materially Weakened The Effect Of Dr. Beyler's "Newly Discovered" Conclusions About The Origin And Cause Of The ECRH Fire On The Jury's Deliberations
            The remaining issue for the Court in determining whether Dr. Beyler's newly discovered opinions about the origin and cause of the fire "'casts real doubt' on the justice of the conviction," Lessieur II, 488 Mass. at 627, is consideration of "the 'over-all strength or weakness of the evidence presented against [Carver]."' Gaines, 494 Mass. at 538; see also Commonwealth v. Mazza, 484 Mass. 539, 550 (2020) (ruling, where "case against the defendant was far from overwhelming," a newly discovered witness statement to police "would have strongly bolstered [defendant's] theory" at trial and "would probably have been a real factor in the jury's deliberations"); Commonwealth v. Imbert, 479 Mass. 575, 583 (2018) (ruling newly discovered exculpatory identification
 
                                                            -55-
 
evidence "would not have influenced the jury" because "the great weight of the evidence inculpated the defendant"); Cowels, 470 Mass. at 608, 619 (ordering new trial in case where there was a "paucity of physical evidence," because "the outcome of the trial would have been different" had newly available DNA testing that excluded co- defendants' and victim's DNA on towels, "been available at the time of the trial").
            To do so, the Court turns to the seemingly significant inculpatory evidence at the trial, including the evidence regarding what the Commonwealth refers to as the aforementioned non-fire science "cornerstones" of its case: (1) Carver's admissions on three separate occasions to setting the fire (i.e., to the Project Rap personnel, Coletti, and Smialek); (2) evidence that Carver had a motive to light the fire (i.e., jealousy of Nickerson's budding relationship Lisa); and, (3) evidence that Carver threatened to do so earlier that evening during his confrontation with Nickerson.
            For the reasons that follow, upon close scrutiny of the Commonwealth's cornerstones, the Court disagrees with the Commonwealth that "the great weight of the evidence inculpated [Carver]." Imbert, 479 Mass. at 583.
(I) Evidence Of Carver's Admissions On Three Separate Occasions To Setting The Fire (i.e., To Coletti, Smialek, And The Project Rap Personnel)
            A close examination of the evidence at the trial of Carver's incriminating statements to Coletti and Smialek reveals that the inculpatory impact of Carver's statements was not as certain as the Commonwealth now claims.
            For example, Carver's highly depressed emotional state when he told Coletti that he started the fire arguably supported Carver's assertion during his closing argument that it was nothing more than a cry for help from a very close friend. In fact, due to
 
                                                            -56-
Carver's extreme hopelessness about his relationship with Lisa, Coletti conceded that, at the time, she questioned whether Carver was being truthful about setting the fire.
            Further, Coletti's credibility and the accuracy of her memory suffered from her two-year delay in disclosing the admission to the police and the absence of evidence that any of the several people she told about the admission shortly after hearing it, including a Beverly firefighter, considered it serious enough to report it to authorities. However, the Court agrees with the Commonwealth that Carver arguably overstates the impact of Dr. Beyler's newly discovered conclusions about the origin and cause of the fire on his admission to Coletti. Carver ignores the undisputed evidence that the stack of newspapers that Eastman delivered to Davis drugstore was moved to the alcove, and that Michaud saw an unidentified man touching and standing over the stack shortly before the fire. Furthermore, there was no dispute during the trial that Lt. Bennet found the burnt stack of newspapers jammed against the alcove wall during the fire.
            Nevertheless, the seemingly inculpatory impact of this undisputed evidence was muted by three additional items of undisputed evidence. First, contrary to Doran's testimony that the point of origin was in the alcove, Carver told Coletti that he set the fire "in the stairwell," the only place that tested positive for the presence of an accelerant. Second, three weeks after the fire, when Michaud was asked by investigators to see if the man she observed hovering over the stack of newspapers was seated inside a courtroom at the Peabody District Court, she failed to identify Carver.[59] Third, Michaud testified that the man she observed was not wearing overalls.
 
--------------------------------------------
 
[59] Carver was seated in the audience in the courtroom at the Peabody District Court wearing a suit and tie. See Tr. Ex. 23, M. Ex. 10H. He was apparently at the courthouse after being charged with threatening to burn down Project Rap in connection with the aforementioned
 
                                                            -57-
 
            As for the evidence of Carver's admission to Smialek that "[he] lit the fire but they have no proof," it, too, suffered from the listener's apparent disbelief of the veracity of the statement as exemplified by Smialek's testimony that, after hearing Carver's admission to setting a much publicized fire that killed fifteen people, he walked away because he did not want to get "involved." Moreover, at the time, Smialek, like Coletti, believed that Carver's admission was "a cry for help" and he failed to disclose the admission to the police until investigators approached him more than two years after the fire.
            Finally, unlike his incriminating statements to Coletti and Smialek, the inculpatory nature of Carver's threats to burn Project Rap less than three weeks after the fire "like he did in Beverly" cannot be overstated. The testimony of the three witnesses who heard the threat was consistent (i.e., "I'll burn your place just like I did in Beverly," according to Ohstrom; "[!]his is the next place I'm going to burn," according to Caproni; and, "[y]ou better watch out or I'll burn that place down, too," according to Lisa). Furthermore, there was no evidence that either of the two social workers who heard Carver's threat to burn down Project Rap had any motive to lie.[60]
            In sum, "[a]lthough the defendant's [inculpatory] statement[s] may have corroborated the [Commonwealth's] arson theory, ...    on the other hand, the new fire science evidence may have caused the jury to question whether the fire was 
--------------------------------------------
 
incident outside Project Rap during which he made the threats in the presence of two Project Rap social works, Susan Ohstrom and Sandra Caproni. See Carver, 33 Mass. App. Ct. at 379 (ruling that "[the judge] acted within his discretion" in excluding "evidence that [Carver] had been acquitted of making threats to burn ... Project Rap").
[60] Carver was apparently acquitted of making threats to burn down Project Rap. See Carver, 33 Mass. App. Ct. at 379 (ruling that "[the judge] acted within his discretion" in excluding "evidence that [Carver] had been acquitted of making threats to burn ... Project Rap").
 
                                                            -58-
 
intentionally set and, therefore, whether the statement[s themselves were] corroborated." Rosario, 477 Mass. at 76 n.10.
(ii) Evidence That Carver Had A Motive To Light The Fire (i.e., Jealousy Of Nickerson's Budding Relationship With Lisa)
            There was no dispute during the trial that Carver was devastated by his recent breakup with Lisa, he was jealous of Nickerson's budding relationship with her, and he expressed anger toward Nickerson and their relationship only hours before the fire. Nevertheless, the only evidence presented at the trial that Carver knew where Nickerson lived before the fire was Coletti's testimony that he told her "he followed them home" in his car. But, Carver didn't say to whose home he was referring, and he did not mention a rooming house, the ECRH or the nearby Davis drugstore.
(iii) Evidence That Carver Threatened To Commit Arson Earlier That Evening During His Confrontation With Nickerson
            Unlike the evidence regarding Carver's motive to set the fire, there was significant conflicting evidence regarding his threat earlier that evening to burn down Nickerson's house. While Page testified that he heard Carver tell Nickerson "I'll kill you and burn your house down" if Nickerson didn't stop seeing Lisa, Laura Proulx, Kobuszewski and Lisa, who were all present during the confrontation in the alley, denied hearing such a threat.
 
                                                            -59-
 
4. Conclusion
            Although the Commonwealth's case did not hinge on a single witness who had "numerous and significant" credibility issues as in Cowels, there was a "paucity of [reliable] physical evidence" against Carver, Cowels, 470 Mass. at 619, a lack of reliable evidence[61] placing him at the scene around the time of the fire, and evidence to the contrary (i.e., Eastman's exclusion of Carver as the man he observed standing in alcove shortly before the fire, Michaud's failure to identify Carver at the show-up at Peabody District Court as the man she observed near the stack of newspapers in the alcove, and the testimony of Carver's parents that he was at home at the time of the fire).
            At bottom, the evidence against Carver "was far from overwhelming." Mazza, 484 Mass. at 550. Therefore, the Court rules that Dr. Beyler's newly discovered opinions about the origin and cause of the fire at the ECRH "'casts real doubt' on the justice of the conviction." Lessieur II, 488 Mass. at 627.
            Accordingly, so much of the Motion that seeks a new trial on the grounds of newly discovered fire science is ALLOWED.
 
--------------------------------------------
 
[61] During its closing argument, the Commonwealth barely mentioned Stanley Clark's identification of Carver and when it did, it argued that "even without" Clark's identification testimony, it had proved beyond a reasonable doubt that Carver lit the fire. Nevertheless, as the Court addresses more fully below in Section Ill, infra, the reliability of Clark's in-court identification of Carver during the trial, like his multiple pretrial identifications of Carver, was questionable, at best.
 
                                                            -68-
 
III. A NEW TRIAL MUST BE GRANTED BECAUSE CERTAIN ADVANCES IN THE SCIENCE OF EYEWITNESS IDENTIFICATION AND MEMORY SINCE CARVER'S TRIAL IN 1989 ARE NEWLY DISCOVERED, AND CAST REAL DOUBT ON THE JUSTICE OF HIS CONVICTIONS
            Notwithstanding the Court's decision to grant Carver a new trial due to advances in fire science, the Court will examine Carver's argument that he should be granted a new trial because certain advances in the science of eyewitness identification and memory since the trial in 1989 qualify as newly discovered evidence that '"casts real doubt' on the justice of the conviction." Lessieur II, 488 Mass. at 627.
A. Many Of The Conclusions Reached By Dr. Franklin Regarding The Unreliability Of Stanley Clark's Identification Of Carver Are Based On Advances In The Science Of Eyewitness Identification And Memory Since Carver's Trial In 1989, And Qualify As "Newly Discovered Evidence"
            The Court must first determine whether certain advances in the science of eyewitness identification and memory since the trial in 1989, upon which Dr. Franklin based her conclusions regarding the unreliability of Clark's identification of Carver (and his vehicle), qualify as newly discovered evidence, as Carver argues.
            Although some research had been conducted on the subject of eyewitness identification and memory before Carver's trial in 1989, according to Dr. Franklin, there has unquestionably been a significant expansion of research since then.
            To be sure, the SJC observed recently in Gaines that "the field of eyewitness identification science did not begin until the late 1970s and early 1980s." Gaines, 494 Mass. at 534 (quotations omitted) (emphasis added). Also, it was not until 2013 that the SJC Study Group issued its Report and Recommendations on Eyewitness Evidence, and not until 2015 that the SJC promulgated a provisional model instruction
 
                                                            -61-
 
incorporating scientific principles to assist the jury in evaluating and weighing
 eyewitness identification testimony. See Commonwealth v. Diaz Perez, 484 Mass. 69, 77 (2020) (observing that since defendant's trial in 2007, "the research on mistaken eyewitness identification is now so broadly accepted scientifically that we have required that instruction on the five principles of eyewitness identification, as identified in studies on mistaken eyewitness identification, be included in the model jury instructions."); Gomes, 470 Mass. at 376 - 377, Appendix  (concluding that five principles of eyewitness identification science were "so generally accepted that they may be stated in a model jury instruction, [the SJC] propose[d] in the Appendix [of the] opinion a new provisional jury instruction regarding eyewitness identification."); see also Commonwealth v. Ayala, 481 Mass. 46, 64 n.20 (2018) (observing that "at the time of trial in 2009, the retention of experts on eyewitness identification was not as prevalent as it is today.").
            For its part, citing the SJC's promulgation of a model eyewitness identification instruction in 1979 in Commonwealth v. Rodriguez, 378 Mass. 296, 310 - 311 (Appendix) (1979), ten years before Carver's trial, the Commonwealth asserts that "many of the concepts relevant to this case - such as suggestive procedures, police feedback, poor lighting, stranger identification, short periods of observation, and long delays between event and identification - were well-known even in 1989, and, in fact, were explored and argued by the defendant at trial." Commonwealth's Opposition, p. 64.
            The Commonwealth also points out that as early as 1983, the SJC observed that "[t]he issue of the admissibility of expert testimony offered to show the unreliability of
 
                                                            -62-
 
eyewitness identification ha[d] received increased attention in State courts in recent years." Commonwealth v. Francis, 390 Mass. 89, 95 (1983). Moreover, by 1983 defendants in the Commonwealth were frequently seeking to offer expert testimony regarding factors that affect the reliability of an identification, such as the susceptibility of witnesses to memory contamination from information supplied after the incident, the negative impact of a high level of stress on the memory, and the minimal "relationship between the certainty and the accuracy of witness's identification." Id. at 93 - 94.
            The Court acknowledges that the "mere[] broadening of the research regarding [a scientific topic] already present in legal and scientific circles[, such as] [t]he mere addition of further information to the preexisting [scientific] debate does not amount to newly discovered evidence' for the purposes of a new trial motion." Commonwealth v. Shuman, 445 Mass. 268, 275 (2005).
            In this case, however, since the trial in 1989, there have been significant, if not ground-breaking, advances in the science of eyewitness identification and memory upon which Dr. Franklin based her conclusions regarding the unreliability of Clark's identification of Carver (and his vehicle). Accordingly, the Court rules that Dr. Franklin's conclusions qualify as newly discovered evidence.
B. Dr. Franklin's "Newly Discovered" Conclusions Demonstrate The Unreliability Of Stanley Clark's Identification Of Carver And Cast Real Doubt On The Justice Of Carver's Convictions Because They Probably Would Have Been A Real Factor In The Jury's Deliberations
            Left for the Court's consideration regarding whether Carver should be granted a new trial because of newly discovered advances in the science of eyewitness identification and memory, is whether Dr. Franklin's conclusions showing the
 
                                                            -63-
 
unreliability of Clark's identification of Carver, which are based on the new science, cast real doubt on the justice of Carver's convictions. Carver argues that Dr. Franklin's testimony would have significantly undermined Clark's identification of him by explaining the various research-based factors that demonstrate that Clark's identification is unreliable.
            For its part, the Commonwealth argues that "such evidence, at best, constitutes a double-edged sword, and would be as likely to harm the defendant's case as to help it." Commonwealth's Opposition, p. 63. For example, according to the Commonwealth, Dr. Franklin's conclusions about the unreliability of Clark's identification would have impeached "identification evidence" that was favorable to Carver, i.e., Michaud's failure to identify Carver at the show-up at Peabody District Court as the man she observed near the stack of newspapers in the alcove at approximately 4:05 a.m. and Eastman's testimony that Carver was not the man he observed in front of the Building at 4:10 a.m. when he delivered the newspapers to the Davis drugstore.
            Moreover, the Commonwealth contends that, without the expert testimony, Carver's trial counsel effectively challenged Clark's identification testimony during the trial by purportedly applying many of the factors of unreliability that Dr. Franklin cites, such as the lighting conditions, the brief length of time Clark had to make the observations, the length of the delay between Clark's observations and his identification of Carver, the multiple presentations of Carver's photograph to Clark by investigators, Clark's selection of the photograph of a filler during the array procedure, and police feedback.
 
                                                            -64-
 
            According to the Commonwealth, the aforementioned double-edged sword and trial counsel's exploration of many of Dr. Franklin's unreliability factors during his cross- examination of Clark show that there is not '"a substantial risk that the jury would have reached a different conclusion had [Dr. Franklin's opinions about the unreliability of Clark's identification] been admitted at trial."' Moore, 489 Mass. at 749. The Court disagrees.
            The Commonwealth mischaracterizes the breadth of defense counsel's purported application of Dr. Franklin's unreliability factors at trial. Although his cross- examination of Clark was lengthy, amounting to more than 100 pages of transcript, and vigorous, it was centered around attempting to show that Clark was, as defense counsel claimed during his closing argument, a "total liar," who was nefariously coached by the police. Admittedly, during his cross-examination of Clark, defense counsel did point out the serial nature and tardiness of the pretrial identification procedures used by police, and he attempted to portray Clark as being tired from a long shift driving a taxicab.
            However, other than one failed attempt during his cross-examination of Clark, the defense counsel barely mentioned the lighting conditions at the street corner. Moreover, during a lengthy cross-examination of Clark that spans more than 100 transcript pages, the extent of defense counsel's application of the aforementioned seven unreliability factors cited by Dr. Franklin was the following single exchange:
Question: In that short period of time going around the corner[.] you can identify the individual in the doorway, his height, color of his hair, length of hair, weight, you can identify the motor vehicle in front of the place, the fact that there is damage to the front grill, the fact there are mag wheels on the car, all of this in the seconds it took you to round the corner at Elliott Chambers. Is that what you're saying?"
            Answer. "That's right."
 
                                                            -65-
 
            This single fleeting leading question hardly amounts to a vigorous application of Dr. Franklin's unreliability factors. To be sure, unlike cases where expert eyewitness identification testimony would have only marginally benefitted the defendant's case at trial because defense counsel otherwise effectively challenged the reliability of an identification, Dr. Franklin's expert testimony, which shows a scientific basis to conclude that Clark's identification of Carver was unreliable, probably would have been a real factor in the jury's deliberations. See cf. Ayala, 481 Mass. at 64 (trial counsel not ineffective for failing to retain and call eyewitness identification expert where counsel vigorously cross-examined eyewitness on poor lighting conditions and inconsistencies in his description of suspect, and presented evidence that eyewitness suffered from PTSD and bipolar disorder, and argued in closing that witness's identification was unreliable due to these factors); Commonwealth v. Watson, 455 Mass. 246, 258 (2009) (trial counsel not ineffective for failing to call eyewitness identification expert where counsel aggressively cross-examined eyewitness about suggestiveness of identification procedure, and impact of trauma of incident, impaired memory, lack of sleep, and "heavy medication" on witness's ability to identify suspect, and forcefully argued same during closing).
            Dr. Franklin's conclusions about the unreliability of Clark's identification systematically apply and elucidate numerous scientifically based factors recognized by the SJC in its decisions over the last decade (or more) as bearing on the reliability of eyewitness identifications. Two of these factors, in particular, powerfully show that the imprimatur of Dr. Franklin's expert testimony would have made a difference during the jury's assessment of Clark's identification.
 
                                                            -66-
 
            First, Clark neither previously knew nor had seen Carver before. Arguably, the impact of this factor on the reliability of an identification may be considered by laypersons as "commonsense." However, Dr. Franklin's testimony regarding the newly developed science of eyewitness identification and memory would have demonstrated that research has shown that the unreliability of stranger identification is far from commonsense. Instead, research has shown that, because people experience how accurately and easy it is to recognize people with whom they are close, they wrongly believe that the same level of accuracy and ease applies when identifying a stranger.
            Second, remembering that the research shows that human memory does not work like a videorecorder, without expert testimony, the jury could not fully appreciate the profound negative impact of the repeated displays of Carver's photograph to Clark by the police, the last time being only a few months before Clark saw (and selected) Carver during the lineup.
            In sum, there was no physical evidence tying Carver to the fire and, leaving aside his aforementioned "admissions," Clark's unreliable identification testimony was the only evidence that directly placed Carver at the scene shortly before the fire. See Commonwealth v. Ellis, 475 Mass. 459, 480 - 481 (2016) ("The determination of whether newly discovered evidence would have been a real factor in the jury's deliberations requires that the new evidence be considered in light of the totality of the evidence presented at trial, and the evidence supporting the defendant's knowing participation in the murder and armed robbery in this case was not overwhelming. There was no eyewitness to the shooting and no physical evidence linking the defendant to the victim's vehicle.").
 
                                                            -67-
 
            As the SJC recognized in convening the SJC Study Group on Eyewitness Evidence in 2011, "eyewitness identification is the greatest source of wrongful convictions." Commonwealth v. Walker, 460 Mass. 590, 644 n.16 (2011). As stated above, the evidence against Carver "was far from overwhelming." Mazza, 484 Mass. at 550. Dr. Franklin 's science-based conclusions about the unreliability of Clark's identification of Carver would have been compelling and, undoubtedly, a real factor in the jury's deliberations. Therefore, the Court rules that Dr. Franklin's testimony about the unreliability of Clark's identification of Carver would have made a difference during the jury's deliberations and, thus, '"casts real doubt' on the justice of the conviction."
Lessieur 11, 488 Mass. at 627.
            Accordingly, so much of the Motion that seeks a new trial on the grounds of newly discovered eyewitness identification and memory science is ALLOWED.
ORDER
            For the above reasons, it is HEREBY ORDERED that the Defendant's Fifth Motion For A New Trial (Paper No. 159) is ALLOWED.